**HENSLEY EQUIPMENT COMPANY, Inc., Appellant,**

v.

**ESCO CORPORATION, Appellee.**

No. 23723.

United States Court of Appeals Fifth Circuit.

Sept. 15, 1967.

William A. McKenzie, Henry Baer, Dallas, Tex., Thomas O. Herbert, Donald N. MacIntosh, Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, Cal., for appellant.

Hugh L. Steger, Dallas, Tex., Jerome F. Fallon, Chicago, Ill., John K. DeLay, Jr., Storey, Armstrong & Steger, Dallas, Tex., Dawson, Tilton, Fallon, & Lungmus, Chicago, Ill., of counsel, for appellee.

Before BELL, GODBOLD and DYER, Circuit Judges.

GODBOLD, Circuit Judge:

Hensley Equipment Company, Inc., appeals from an adverse decision in a patent infringement action brought by Esco Corporation, assignee of United States Patent No. 2,919,506 (the " '506 patent").[1]

The suit concerns excavating teeth to be attached to the digging edge of power shovel buckets and similar excavating equipment. Because of the stress and abrasion to which such a digging edge is subject the teeth must be replaceable. For a number of years two-part teeth have been available, each consisting of an "adapter" affixed to the bucket or digging apparatus and a "wear point" which is the forward or "spike" portion of the tooth. A projection of the adapter fits into a socket in the rear of the wear point. The wear point is held on the

---

1. 251 F.Supp. 631 (N.D.Texas, 1966).

adapter by a removable pin. While adapters periodically must be replaced, the wear points bear the brunt of the abrasion and are replaced more frequently.[2]

Prior to the marketing of teeth produced under the '506 patent most two-piece excavating teeth had a wedge-shaped projection on the adapter with a correspondingly-shaped socket in the rear of the wear point. The horizontal surfaces of wedge-shaped adapter and point were the bearing surfaces at which the two parts came in contact. The bearing surfaces were flat. Under some operating conditions lateral pressure or thrust on the tooth caused sideways movement, producing a pivoting action between adapter and wear point, reducing the full (or substantial) contact or bearing between the two parts, causing instead "point contact" concentrated in a small area of the two bearing surfaces. Under these conditions the teeth were subject to rapid distortion and wear and often broke under the concentrated pressure.

Insofar as can be stated in non-technical terms, the invention which the '506 patent (described as "Excavating Tooth and Base Support Therefor") purports to embody is as follows. A conical bearing surface is employed on the adapter and on a correspondingly shaped socket in the wear point. Both the conical surface of the adapter and the conical surface of the wear point have, as a matter of geometry, a common vertical axis. Each conical surface comprises only a segment of a cone. See Figures 5 and 7 of drawings contained in the patent and made an appendix to this opinion, showing a structure with a complete conical surface (labelled 40) and demonstrating how a segment thereof (labelled 43 in Figure 7) is used to form the bearing surface of the adapter.[3]

Employing more technical language, the bearing surfaces of adapter and point are described in a number of claims as "surfaces of revolution" around a vertical axis.[4] The concept of use of a "surface of revolution," as opposed to surfaces which cannot be created by a single line rotated about a constant axis, is significant, and the creation of the two conical bearing surfaces of wear point and adapter around a common vertical axis likewise is significant.

The invention contemplates that because of the design of the bearing surfaces lateral movement produces little or no change in bearing contact between wear point and adapter. Irrespective of the relative positions of the two mem-

2. On some pieces of equipment, (drag lines used in strip mining coal) the bucket weighs 100 tons and moves 85 cubic yards of material at a bite, each tooth is 13 inches wide and weighs 425 pounds, and in use the teeth become so hot that they smoke and cannot be touched with the hand. Esco conical teeth vary from that size to as small as two inches wide, weighing three pounds.

3. Figure 6 demonstrates a nose and socket structure comprised of a conical surface on the adapter engaging a corresponding conical surface on the point (see 44, 47 and 48) but with a flat surface (45) of the adapter engaging the flat surface (46) of the upper socket wall of the point—this is a "single cone" construction. Figure 4 shows a nose and socket structure with conical surfaces on upper and lower socket surfaces of the adapter and corresponding surfaces on the point —this is "double cone" construction, and its advantage is that the point, when worn on one side, can be reversed on the adapter.

4. Hensley's expert defined "surface of revolution" as follows:
   "A surface * * * is a two dimensional figure and * * * can be described by or * * * produced by a single dimensional figure or line. * * * [W]e can take any line whatsoever and rotate it about a constant vertical axis and the figure which the line sweeps out is a surface of revolution. * * * [The shape of the surface] depends entirely on the shape of the line which generates it."
   An umbrella demonstrates the concept more graphically. If the handle is considered the vertical axis and a single rib the rotating line, spinning the handle (thus rotating the line around the axis) causes the rib to define a surface of revolution in the shape of the cloth of the umbrella.

bers their bearing surfaces remain in substantial contact, and no concentration of pressure develops at one or more points.

The conical tooth enjoyed significant commercial success, and in 1962 Esco received for it an award by a trade magazine, based on selection made by a panel of international mining and metallurgical experts, for "achievement in equipment development by aiding the technological advancement of the mining industry."

In 1965 Hensley began to sell wear points designed, intended, and advertised and held out to the public, as replacement points for Esco adapters. It did so after having supplied a steel company with models of Esco points and an Esco adapter and ordering the points be copied with certain modifications. Hensley publicly referred to its said wear points as "Esco-type points." The points will not fit adapters of any company other than Esco. Later Hensley began to market adapters for one of Esco's smaller conical points. In its catalogs it describes these wear points and adapters as "conical." Since the beginning of this litigation Hensley has acquired a steel foundry and now manufactures as well as sells the products described above.[5] Hensley also markets parts corresponding to products manufactured by Esco but not under the patent at issue [6] and by other manufacturers.

Esco's complaint alleged that Hensley had infringed the '506 patent by making and selling tooth points. Hensley answered, denying the validity of the '506 patent and infringement and alleging that sale of wear points constitutes legitimate repair. It also alleged that Esco was barred by misuse from enforcing the '506 patent. Several counterclaims were asserted, alleging in substance that Hensley manufactured and sold replacement wear points for those manufactured by Esco under United States Patents No. 3,026,947 and No. 3,079,710 as well as the '506 patent; that these patents were invalid; that Esco had violated the antitrust laws by bringing the present suit and by using the patents on products outside their scope. Hensley asked a declaratory judgment that all three patents are invalid, that Hensley was not infringing any of them, and that Hensley, its supplier and customers, could continue to manufacture, use, and sell the teeth and wear points without interference. Injunctive relief, and triple damages also were demanded.

The district court held that the '506 patent is valid; that Hensley has infringed it; that Esco has not misused the patent, and that Esco is entitled to damages. Hensley was enjoined from further infringement of the '506 patent. The counterclaims were dismissed with prejudice except as related to validity and infringement of the '947 and '710 patents.

## I.

Hensley challenges the position of the district court that the patent claims included a conical surface of revolution.

The claims, construed in the light of the specifications and drawings,[7] make clear to one familiar with the field involved that the surfaces of revolution—the bearing surfaces—are to be conical, or nearly so, and are not to be flat. We hold that the patent was properly considered as claiming conical surfaces of revolution.

## II. Validity.

The district court did not err in finding against Hensley on its defenses of anticipation under 35 U.S.C.A. § 102 and

5. Texas Steel Company, which manufactured the accused articles prior to Hensley's acquiring its own manufacturing facilities, was named as a defendant but was dismissed by stipulation.

6. Recently the Ninth Circuit affirmed a judgment against Hensley for infringement of another Esco patent. Hensley Equipment Co. v. Esco Corp., 375 F.2d 432 (9th Cir., 1967), affirming 265 F. Supp. 863 (N.D.Cal., 1965).

7. "[I]t is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." United States v. Adams, 383 U.S. 39, 49, 86 S. Ct. 708, 713, 15 L.Ed.2d 572, 579 (1966).

obviousness within the meaning of 35 U.S.C.A. § 103.

We need discuss at length only the closest prior art, the Hensley '601 wear point, marketed by Hensley since 1955 for use on its single-shank "rippers."[8] Testimony was produced that as rippers were used with tractors of higher power more breakage was experienced with the wear points, which had rectangular, or flat-surfaced, sockets to receive the wear collars. Therefore, Hensley began experimenting in 1951 or 1952 with a socket containing curved top and bottom, and in 1954 began marketing a wear point with such a feature. Subsequently larger models differing somewhat in the contour of the socket were marketed by Hensley. The 601–H, the model introduced at trial and relied upon by Hensley, was marketed in 1955 or 1956. Conflicting evidence was produced of the nature of the contour of the socket of the 601–H, and the district court found as a fact that it did not constitute a conical surface of revolution. Hensley argues that this is clearly erroneous and that the 601–H tooth literally anticipated the '506 patent or made its subject matter obvious to one skilled in the art.

It is clear that the 601–H point was an attempt to use a rounded socket connection between a wear point and its support to reduce breakage. But Esco's expert, Professor William Tiller of Stanford University's Department of Material Science, testified that the '506 conical point differed significantly in both theory and engineering design from the Hensley 601–H point. The socket shape of the 601–H point, he testified, was approximately an elliptical paraboloid. While it avoided some problems encountered with the rectangular socket models, rotational forces would cause the outer part of the 601–H to "ride up" over the inner part so as to cause "line contact", i. e., contact along a line of limited dimension as opposed to substantial surface-to-surface contact of bearing surfaces. This resulted in wearing of the adapter so as to distort its original shape. The '506 conical design possesses all the advantages of the 601–H shape plus the advantage of accommodating the rotational forces and movement; any wear, he testified, simply makes the cone fit better. He concluded there was little relationship between the '506 conical tooth and the Hensley 601–H.[9]

The district court did not err in finding that the 601–H tooth (and other prior patents) did not anticipate the '506 patent insofar as that patent claimed a conical surface of revolution about a vertical axis. Nor does the evidence establish that the conical design would have been obvious to one skilled in the art at the time of the invention.[10] In this connection the district court gave appropriate recognition to the secondary indicia of commercial success and industry recognition of satisfaction of unsolved needs, referred to in *John Deere*. 383 U.S. at 17–18, 86 S.Ct. at 693–694.

Hensley contends that prior patents disclosing flat bearing surfaces (especially

---

8. A "ripper" is a device installed on the front or rear of a bulldozer or on the sides of a tractor. It consists of a shank extending beneath the surface of the ground which, when pulled or pushed through the ground, "rips" it up. Hensley's rippers had replaceable wear points attached to "wear collars," corresponding in function to adapters.

9. Another witness, Grove, described the inside surface of the 601–H point, viewed as though cut through in vertical sections, to be a series of ellipses, starting from an ellipse at the front end, to an ellipse at the rear end, and midway approximately a circle.

10. It is desirable that the district courts make specific findings on the factual matters which the Supreme Court, in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), held determined obviousness: the state of the prior art, the level of ordinary skill in the art, and the difference between the prior art and the claims of the patent at issue. 383 U.S. at 17, 86 S.Ct. 684. That case was decided after the trial and decision in the present case, so it is understandable that the findings of the district court are not as explicit as they might be; however, we see no necessity of remanding for more explicit findings.

Baer, No. 2,483,032) anticipated. But the testimony was in conflict whether a flat surface correctly can be described as a "surface of revolution." Also we have held that the '506 claims, read in light of the specifications, disclose that the invention included nose and socket contours either conical or similar or equivalent thereto. Nor does the fact that the Hensley 601–H device, and prior patents (especially Morrison, No. 2,050,014), employed the concept of concave-convex bearing surfaces for wear point and adapter necessarily make obvious the particular type of surfaces embraced by the '506 patent, though they are within the generic term "concave-convex." Much more is embraced in the '506 than concavity and convexity.

Downie, No. 1,399,337, had a flat surface plus some tin inserts which from use conceivably might be worn or extruded so as to create arched or curved surfaces.[11]

The appellant contends the trial court erred in stating the presumption of validity prescribed by 35 U.S.C.A. § 282 must be overcome by clear and convincing evidence, arguing that the Patent Office failed to consider pertinent prior art and thereby removed or weakened the presumption. See Zero Mfg. Co. v. Mississippi Milk Producers Ass'n, 358 F.2d 853 (5th Cir., 1966); Up-Right, Inc. v. Safway Prods., Inc., 364 F.2d 580 (5th Cir., 1966). But we have no hesitancy in holding that the patent in issue meets standards of validity without the necessity of resting it upon any presumption.

The findings and conclusions of the district court on the issue of validity are affirmed.

## III. Infringement

The evidence was in conflict whether the configuration of the Hensley point was such that it embraced surfaces of revolution. Likewise there was evidence both ways on whether the Hensley point, when placed on an Esco adapter, sufficiently meets and remains in contact with it that it is within the requirement of the claims that bearing surfaces of wear point and adapter "remain in fitting contact" during movement of the wear point.[12] We are not able to say the district court was plainly erroneous on these factual questions.

Hensley also contends that sale of wear points alone cannot be infringement because, insofar as the '506 patent attempts to claim the wear point alone as an invention, it lacks the statutory requirement of utility. 35 U.S.C.A. § 101. Hensley reasons that the wear point alone serves no useful function unless combined with the adapter. It is urged that we treat the situation as one of replacement of an unpatented part of a patented machine in the exercise of the right of legitimate repair.[13]

But the invention of the '506 patent is not simply a combination of elements, all previously known, into a purportedly new machine. It is a machine composed of two basic parts, a wear point and an adapter, each of which contains an integral portion of the novel factor, a bearing surface made in the form of a conical surface of revolution. The claims embrace the complete machine, i. e., the excavating tooth, and also the two basic parts, wear point and adapter. Utility of the wear point is not lost because it

---

11. While we specifically discuss Baer, Morrison and Downie we note that Hensley's expert testified none of them were as close to the patent in suit as the Hensley 601–H, which he considered the closest prior art.

12. For example, there was evidence that the lesser surface contact of the Hensley point is caused by inevitable variations in mass production; that the relevant contact is that encountered under the severe pressures of actual operation,

and that Hensley's points functioned adequately on Esco's adapters; that Hensley checks all its conical points for fit against an Esco adapter before shipping them.

13. See Wilbur-Ellis Co. v. Kuther, 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964); Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); Fromberg, Inc. v. Thornhill, 315 F.2d 407 (5th Cir., 1963).

must be used with something else to produce an advantageous result.

■ Since in manufacturing and selling patented wear points Hensley infringed specific claims of the patent, it cannot be protected by the doctrine of legitimate repair. Walker, Patents §§ 379, 509 (1937 Ed.). "To supply patented parts of a patented combination without authority from the patentee to purchasers of the combination is a direct infringement of the claims of the patent on the part and a contributory infringement of the claims of the patent on the combination, assuming that the requirements of 35 U.S.C. § 271(c) are otherwise met. (citing cases)." Warner & Swasey Co. v. Held, 256 F.Supp. 303, 311 (E.D.Wis., 1966).

## IV. Misuse

Assuming validity and infringement of the '506 patent, is Esco barred from enforcing its rights because it has misused the patent?

■ The constitutional provision authorizing congressional grants of patents [14] is "both a grant of power and a limitation," Graham v. John Deere Co., supra. Neither Congress nor the courts may exercise or apply the patent authority in such manner as to give a patentee more than the rewards of his discovery. "Under the patent law the patentee is given by statute a monopoly of making, using and selling the patented article." United States v. General Electric Co., 272 U.S. 476, 485, 47 S.Ct. 192, 195, 71 L.Ed. 362, 363 (1926). Pursuant to this monopoly the patentee may exploit his exclusive rights as he sees fit, but should his exploitation exceed means "normally and reasonably adapted to secure pecuniary reward for the [patent] monopoly,"

his actions become subject to the same restraints as are imposed upon those not protected by a patent's monopoly, such as the antitrust laws. United States v. General Electric, supra.

■ One who attempts to exploit a patented invention beyond the scope of the patent monopoly may be the subject of a judicially-imposed disability to enforce the patent. "It is now * * * familiar law that the courts will not aid a patent owner who has misused his patents to recover any of their emoluments accruing during the period of misuse or thereafter until the effects of such misuse have been dissipated, or 'purged' as the conventional saying goes. (citing cases.) The rule is an extension of the equitable doctrine of 'unclean hands' to the patent field." United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465, 471 (1957). But the simplicity with which the rule may be stated is misleading. In 1955 the Attorney General's National Committee to Study the Antitrust Laws commented that "the outer reach of the misuse doctrine has not yet been fully defined." [15] Eleven years later in 1966 the President's Commission on the Patent System reported that uncertainty as to the precise nature of the patent right coupled with lack of doctrinal clarity in the misuse rule has "produced confusion in the public mind and a reluctance by patent owners and others to enter into contracts and other arrangements pertaining to patents or related licenses." [16]

■ The doctrine of misuse was developed by the Supreme Court in a series of early cases as a defense against contributory infringement. [17] In 1942 the

14. Art. I, § 8 of the Constitution authorizes Congress "to promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries."

15. Report of the Attorney General's National Committee to Study the Antitrust Laws 251 (U. S. Government Printing Office, 1955).

16. To Promote the Progress of * * * Useful Arts 37 (U. S. Government Printing Office, 1966).

17. E. g., Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931); Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938).

Court applied it in a case of direct infringement. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). See also B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942). The rationale of the doctrine is a rejection of the concept of the patent as an absolute property right in favor of its definition as a right which must not be exercised in a manner not consistent with the constitutionally-defined purpose for which it was conferred, i. e., to "promote the Progress of * * * useful Arts." In Mercoid Corp. v. Mid-Continent Invest. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 271, 88 L.Ed. 376, 380 (1944) Mr. Justice Douglas emphasized that to allow an infringement suit by a patentee who has misused his patent "would be to extend the aid of a court of equity in expanding the patent beyond the legitimate scope of its monopoly." It is not necessary that the defendant asserting the misuse defense has been—or would be—injured by the misuse. In Morton Salt Co. v. G. S. Suppiger, supra, Mr. Justice Stone wrote:

> "It is a principle of general application that courts * * * may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of

whether the particular defendant has suffered from the misuse of the patent. * * * The patentee, like those other holders of an exclusive privilege granted in the furtherance of a public policy, may not claim protection of his grant by the courts where it is being used to subvert that policy." 314 U.S. at 492–495, 62 S.Ct. at 405–406.

▪ Misuse of a patent in no way affects the validity of the patent itself, and once the patentee had "purged himself" he may again enforce his patent by infringement suits. E. g., United States Gypsum Co. v. National Gypsum Co., supra.[18]

Where a contract clause forms the basis for a misuse defense a mere showing that the clause is not enforced has been held insufficient to dissipate the misuse or to prevent a successful assertion of the defense. Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782 (9th Cir.,), cert. denied, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964).

▪ Since the activities giving rise to patent misuse frequently have actual or anticipated adverse effects on competition, there is a close relationship between the patent misuse doctrine and antitrust law. "[S]o long as the patent owner is using his patent in violation of the antitrust laws, he cannot restrain infringement of it by others." Hartford-Empire Co. v. United States, 323 U.S. 386, 415, 65 S.Ct. 373, 388, 89 L.Ed. 322, 362 (1945).[19]

18. See McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 407–408 (10th Cir., 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 751 (1966); Turbo Machine Co. v. Proctor & Schwartz, Inc., 241 F.Supp. 723, 729 (E.D.Pa., 1965), aff'd, 362 F.2d 5 (3rd Cir., 1966).

19. Because of the decision we reach we need not decide between conflicting views of whether it is necessary to a successful assertion of the defense of misuse that all elements of civil or criminal liability under the antitrust laws be shown. The cases indicate no such standard of proof is required. Morton Salt Co. v. G. S. Suppiger Co., supra, 314 U.S. at

490, 62 S.Ct. 402; Berlenbach v. Anderson & Thompson Ski Co., supra, Laitram Corp. v. King Crab, Inc., 245 F.Supp. 1019 (D.Alaska, 1965). Note the conclusion of the Attorney General's Committee that "from some abuses of patent policy [sufficient to justify non-enforcement of the patent] may flow consequences not drastic enough to meet antitrust prerequisites of effect on competition. In addition, many patent abuses are more effectively curbed by simply denying relief as a matter of patent policy," (Report, at 254.)

But compare the view of Kennedy, Patent and Antitrust Policy; the Search for a Unitary Theory, 35 Geo.Wash.L.

With these preliminary observations, we return to the case before us.

## A. Exclusive dealerships

Esco products, including teeth manufactured under the '506 patent, are sold through a network of independent dealers. A policy statement distributed by Esco to its dealers contains, among other clauses, the following:

"Dealers will not stock or sell competitive products unless prior arrangements have been made with ESCO."

Appellant urges that Esco, by requiring its dealers to sell only Esco products, is misusing the patents under which these products are manufactured.

■ There is no proof in this case of an absolute contractual duty that Esco dealers not handle competing products.[20] There was evidence that because of the limited market for points and adapters it is neither practical nor economical for a dealer to carry more than one·manufacturer's line of products. There was testimony that some Esco dealers did carry teeth made by other manufacturers (though Esco did characterize these as very minor situations which it has "chosen to overlook"). There was no evidence that Esco has refused to make "prior arrangements" with any dealer indicating a desire to stock or sell competitive products, and the district court found that Esco has not terminated any dealership for failure to comply with the policy statement.

Because no contractual condition was proved to exist there was no proof of misuse in the form of exclusive dealerships.[21]

## B. The Esco-Caterpillar License

The Esco-Caterpillar agreement, insofar as pertinent to our purposes, may be summarized as follows: Caterpillar is granted a license "to manufacture, to have manufactured, to use and to sell" articles embodying the inventions covered by all patents contained in an incorporated schedule; this includes, in addition to the '506 patent, two other United States

Rev. 512 (1966), at 560: "Faulty reasoning * * * underlies the widely held view that extra patent restraints of no competitive significance justify the denial of injunctive relief. * * * Attempts at metaphysical distinctions between patent policy and antitrust policy violations serve no constructive purpose * * * [Defendants asserting misuse] defenses should be held to substantive standards of violation evolved under the Sherman, Clayton or Federal Trade Commission Acts."

Certainly a case of misuse not sufficient to constitute a violation of the antitrust laws requires careful synthesis of the policies represented by the patent and the antitrust laws. Kennedy, supra. Baxter, Legal Restrictions in Exploitation of the Patent Monopoly: An Economic Analysis, 76 Yale L.J. 267 (1966).

20. A contractual duty (even if not enforced) may be sufficient to constitute misuse. See Berlenbach v. Anderson & Thompson Ski Co., supra. A specific agreement not to handle competitive products without prior written approval may be enough. F. C. Russell Co. v. Consumers Insulation Co., 226 F.2d 373 (3rd Cir., 1955).

21. In addition, the trial court found that the existence of the company policy had not substantially lessened competition or created a monopoly in any line of commerce. As to whether, in a case where a contractual condition does exist, misuse is established merely by proof of the condition, or there must be proof of effect on the relevant market, see McCullough v. Kammerer Corp., 166 F.2d 759 (9th Cir., 1948); National Lockwasher Co. v. George K. Garrett Co., Inc., 137 F.2d 255 (3rd Cir., 1943); Waco-Porter Corp. v. Tubular Structures Corp., 220 F.Supp. 724, as modified by 222 F.Supp. 332 (S.D.Cal., 1963) [in the second opinion, the district court expressly adopted the view, rejected in the first opinion, that it was not necessary to show lessened competition to establish misuse]; Steffen v. W. J. Schoenberger Co., 90 F.Supp. 710 (N.D.Ohio, 1950); Park-In Theatres Inc. v. Paramount-Richards Theatres, Inc., 81 F.Supp. 466 (D.Del., 1948). Compare Preformed Line Products Co. v. Fanner Manufacturing Co., 225 F.Supp. 762 (N.D.Ohio, 1962), aff'd, 328 F.2d 265 (6th Cir., 1964).

patents and the foreign equivalents to these. The license extends only to tooth points, adapters, pins and plugs of dimensions and designs corresponding to incorporated exhibits. The items involved are parts for Caterpillar equipment. The license is stated to be "exclusive," but Esco, and others it may choose to license, are not excluded from manufacturing the parts and selling them to Caterpillar, if Caterpillar wishes to buy them. Royalties are fixed by a formula (discussed below), but no royalties are payable on items manufactured by Esco or its subsidiaries, successors, assignees or licensees and purchased by Caterpillar.

The "exclusive" nature of the agreement may be terminated by Esco if Caterpillar's use of the patents falls below a prescribed level (see discussion below).

Provision is made for Caterpillar to extend its license to subsidiaries and licensees if Caterpillar agrees to assume liability and responsibility to Esco for the acts and omission of the extendees pertaining to the agreement.

Under the agreement Caterpillar may manufacture the parts, or have them manufactured for it by one other than an Esco licensee or subsidiary. If it does so it pays royalties on parts so made. In practice it has not exercised this right, although it has investigated the feasibility of doing so in several instances, particularly in foreign countries. In practice Caterpillar has continued to purchase all the parts from Esco and its subsidiaries and licensees. (Esco is bound to use its best efforts to have any licensee who may obtain from it a license agreement covering its tooth points and adapters enter into an agreement to manufacture and sell to Caterpillar the items involved. In practice Esco has sought such agreement with at least some of its licensees.)

Parts thus made for Caterpillar have the Caterpillar name thereon.

The agreement contains a specific condition which we set out in the margin.[22] The agreement does not restrict the condition to items manufactured by Caterpillar. Patent monopoly is "exhausted" by the first authorized sale of the patented item, and the patent law does not protect attempts by the patentee or his licensees to control use of the product after such sale. United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). See also Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917), overruling Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645 (1912). United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (June 12, 1967), holds it a per se violation of the Sherman Act for a manufacturer to restrict persons to whom an article may be traded after the manufacturer has parted with dominion over it.

"Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with which an article may be traded after the manufacturer has parted with dominion over it. White Motor, supra [White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738]; Dr. Miles, supra [Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502]. Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale. To per-

22. "[P]rovided, however, that such license is further restricted to the use of licensed products and/or sale of licensed products for original installation on products or equipment manufactured by or for CATERPILLAR and sold by CATERPILLAR and by CATERPILLAR dealers throughout the world and to use as replacement parts sold by CATERPILLAR and by CATERPILLAR dealers throughout the world for such products and equipment."

mit this would sanction franchising and confinement of distribution as the ordinary instead of the unusual method which may be permissible in an appropriate and impelling competitive setting, since most merchandise is distributed by means of purchase and sale. (87 S.Ct. 1865)

\* \* \* \* \* \*

"Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a per se violation of § 1 of the Sherman Act." (87 S.Ct. 1867)

Under *Hartford-Empire,* supra, this per se violation of the antitrust laws bars Esco from enforcing its patent in this case.

■ There are equitable considerations present running both ways. It is not clear that the restriction limiting resale of parts to Caterpillar dealers was required by Esco for its purposes or even desired by it. Schwinn was pursuing its own interests. There was some evidence that Esco actually does not know, though it assumes it, whether Caterpillar is making resales to its dealers only, and there is no evidence of Esco taking any action to enforce the condition or even caring whether it is enforced. The Supreme Court found Schwinn "firm and resolute" in insisting upon observance of customer (and territorial) restrictions. Schwinn combined customer restrictions with territorial restrictions; there are no territorial restrictions in the case before us. Schwinn confined access to its product to dealers it selected; the agreement here confines access to dealers Caterpillar selects. Only a small fraction of Schwinn's sales were involved, while Caterpillar is the giant of the equipment industry and is Esco's best customer. As we understand the interplay of

*Schwinn* and *Hartford-Empire,* and the underlying patent policy, there is no inquiry into purity of heart vs. bad motive, or market impact, or matters of what may seem to be essential fairness—a per se violation of the Sherman Act is deemed such a monopolistic action that the patentee is barred from enforcing the limited and special monopoly given him by the patent laws.

C. Attempt to extend royalty payments beyond life of patent

The agreement with Caterpillar does not attempt to extend royalty payments on the '506 and other patents beyond the life of those patents.

In Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), the Supreme Court considered a suit for royalties on a use license covering twelve patents, all but one of which expired before the expiration of the agreement (17 years after the sale). Only seven were incorporated in the purchased article (a portable hop picking machine) which the license permitted the purchaser to use; all of these expired before the termination of the agreement. The royalty payable under the agreement was a $500 minimum per season or $3.33⅓ per 200 pounds of hops harvested, whichever was greater. The Court held that no royalties could be collected which accrued after expiration of the last patent incorporated into the machine, as "a projection of the patent monopoly after the patent expires is not enforceable." Significantly, the Court voiced no objection to the fact that the royalty rate did not vary when some, but less than all, of the patents incorporated into the device expired. Compare American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769 (3rd Cir.), cert. denied, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959); Ar-Tik Systems, Inc. v. Dairy Queen, Inc., 302 F.2d 496 (3rd Cir., 1962), and Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc., 367 F.2d 678 (6th Cir., 1966); Technograph Printed Circuits, Ltd. v. Bendix

Aviation Corp., 218 F.Supp. 1, 48–49 (D. Md., 1963), aff'd, 327 F.2d 497 (4th Cir., 1964).[23]

■ We need not further discuss the case law because Hensley's contention is based on a misconstruction of the agreement. In addition to the '506 patent the agreement covers two other United States Letter Patents and the foreign equivalents of all three. Patent No. 3,126,654 covers the pin and plug used in connection with the wear point and adapter ordered by the '506 patent. The agreement, as related to Patent No. 3,079,710, also covers wear points for use on "rippers", devices used on Caterpillar's front end loaders when the loading apparatus has been removed. The royalty provisions provide for royalties "for each tooth point, adapter, pin or plug manufactured by or for and sold by Caterpillar during the life of this Agreement and embodying an invention disclosed and claimed in a Licensed Patent." For each tooth point, pin or plug, the royalty is set at five per cent of the net price of the item; for each adapter, the royalty is seven and one-half per cent of the aggregate net prices for the tooth point, pin and plug used on the adapter. The agree-

ment specifically provides that "no royalties shall be * * * paid by Caterpillar on points, adapter, pins or plugs manufactured and sold in any country or countries in which ESCO has neither an unexpired patent nor a pending application for a patent disclosing and claiming an invention incorporated in the point, adapter, pin or plug."

No single item which Caterpillar is licensed to manufacture will embody more than one of the United States Patents covered by the agreement. The district court made a specific finding that the agreement imposed no liability on Caterpillar to pay royalties on articles covered under an expired Esco patent. This agreement is one step further from illegal extension of royalty payments than the situation in Brulotte v. Thys Co., supra, where the court refused to disapprove a requirement that royalties on an item embodying the inventions of more than one patent be maintained when some but less than all the patents had expired.[24]

## D. Termination of exclusivity

■ Hensley theorizes that par. 11 of the agreement,[25] dealing with termi-

23. See generally, Comment, Post Expiration Royalty Payments and Mandatory Package Licensing as Patent Misuses, 11 Vill, L.Rev. 382 (1966); Note, 1965 Duke L.J. 836.

24. Cf. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). Nor can there be any question of coercive package licensing. See United States v. Paramount Pictures, Inc., 334 U.S. 131, 156–159, 68 S.Ct. 915, 92 L.Ed. 1260, 1292 (1948); American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769 (3rd Cir.), cert. denied, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959); Note, 73 Harv.L.Rev. 1628 (1960). There is no indication here that Caterpillar was in any way coerced into unwillingly accepting any of the patents as a condition of being licensed to practice the others; in fact, the evidence suggests inclusion of all was necessary for the accomplishment of Caterpillar's objectives. See

McCullough Tool Co. v. Well Surveys, Inc., supra.

25. "The exclusive license herein granted shall cease to be exclusive and shall become nonexclusive as to a tooth point, adapter, pin and plug of the design and dimensions illustrated in any of Exhibits A, B, C, D, E and F and any Exhibits added hereto by amendment, if CATERPILLAR shall totally discontinue both the use and sale of such tooth point, adapter, pin and plug and if following such discontinuance ESCO shall give CATERPILLAR ninety (90) days' prior written notice of its election to make the license herein granted a nonexclusive one for such tooth point, adapter, pin and plug. In addition, the exclusive license herein granted shall cease to be exclusive and shall become nonexclusive as to a tooth point, adapter, pin and plug of the design and dimensions illustrated in any of Exhibits A, B, C, D, E and F and any Exhibits added hereto by amend-

nation of the so-called "exclusivity" feature of the license, violates Sections 1 and 2 of the Sherman Act as a contract in restraint of trade and an attempt by Esco to monopolize commerce in the replacement market for wear points and adapters for the types of Caterpillar-made equipment on which they are usable. Its argument runs as follows. Caterpillar must continue purchasing or using the license products exclusively or face competition from the Esco dealers in the replacement market for wear points and adapters for Caterpillar equipment. Caterpillar is deterred from changing to non-patented products or products outside the license agreement, and Esco is insured against competition from such products being used in lieu of the Esco conical teeth. The agreement is, in effect, one between two manufacturers not to compete with each other.

The agreement does not require as a consideration for securing the "exclusive" license that Caterpillar use the licensed products to the exclusion of all others. At all times Caterpillar may offer competing products as replacement parts even to the total exclusion of the licensed products, so long as there has been no previous "substantial discontinuance" of use on new equipment. There are no agreements not to use the products of competitors of Esco. Caterpillar has the full right to have the items manufactured for it by others, who are or would be Esco's manufacturing competitors. It was shown that Caterpillar is a giant of the industry that manufactures equipment employing the conical teeth, but its status as a manufacturer of teeth (and

other parts)—new or replacement—is another matter. Also the agreement insures that Caterpillar may not, through non-use, deprive the patentee and the public of benefits of the patent as applied to Caterpillar parts. If Caterpillar limits the practice of the invention as to Caterpillar parts to below the limits prescribed then Esco is free to practice it. There are no price fixing agreements, no division of geographical markets, no effort to extend the grant of the patent to un-patented devices.

Hensley does not suggest that the termination of exclusivity clause is within the narrow range of monopolistic practices denoted as per se violations of the Sherman Act.

Insofar as par. 11 is concerned the district court was not plainly erroneous in finding there was no misuse.

## V. Counterclaims

■■■ The district court held it had no jurisdiction of validity and infringement of Esco's patents 3,026,947 and 3,079,710, which Hensley had sought to raise by counterclaims, since Esco had not charged Hensley with infringement thereof. Hensley asserts this as error but cites no authority or explanation for its contention. The right of a party to seek a declaratory judgment is subject to the "same transaction or occurrence" requirement of Fed.Rule Civ.Proc. 13 (a) and the "same subject matter" test of Rule 13(b), relating to counterclaims. The district court correctly found it had no jurisdiction to litigate validity and infringement of these two patents.

ment, if at any time after December 31, 1966, CATERPILLAR (including its extendees who for this purpose shall be considered in the aggregate with CATERPILLAR) shall substantially discontinue the use of such tooth point, adapter, pin and plug on original equipment manufactured by or for CATERPILLAR, and if in any calendar year after such discontinuance the aggregate sales (based on net price as defined in paragraph 3 hereof) of such tooth point, adapter, pin and

plug amounts to less than forty per cent (40%) of one third of the aggregate sales (based on net price as defined in paragraph 3 hereof) of such tooth point, adapter, pin and plug in the three (3) calendar years immediately preceding such discontinuance and ESCO subsequently gives CATERPILLAR written notice of its election to make the license herein granted a nonexclusive one for such tooth point, adapter, pin and plug."

* * *

The findings of the district court that the patent is valid and that Hensley has infringed the patent are affirmed. The finding that Esco has not misused the patent is reversed. Remanded to the district court with direction to dismiss the case.

## APPENDIX

Jan. 5, 1960          P. V. LARSEN          2,919,506

EXCAVATING TOOTH AND BASE SUPPORT THEREFOR

Filed April 21, 1958                    4 Sheets-Sheet 2

INVENTOR:
Paul V. Larsen,
BY Dawson, Tilton, Fallon & Lungmus,
ATTORNEYS.