**In re YARN PROCESS PATENT VALIDITY AND ANTI–TRUST LITIGATION.**

**M.D.L. No. 82.**

United States District Court,
S. D. Florida.

April 25, 1974.

Supplemental Opinion Feb. 27, 1975.

Edwards, Irons, Irons, Sears & Santorelli, Washington, D. C., McNeill Smith, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., William W. Beckett, Schuyler, Birch, Swindler, McKie & Beckett, William K. West, Jr., Cushman, Darby & Cushman, Washington, D. C.,

David Klingsberg, Kaye, Scholer, Fierman, Hayes & Handler, New York City, Paul B. Bell, Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., Anthony F. Phillips, Willkie, Farr & Gallagher, New York City, Fowler, White, Humkey, Burnett, Hurley & Banick, P. A., Miami, Fla., Gerald Kurland, Cleveland, Ohio, Friedman, Britton & Stettin, Miami, Fla., David Rabin, Greensboro, N. C., John J. McAleese, Jr., Cunniff, Bray & McAleese, Plymouth Meeting, Pa., William R. Alvin, Miami, Fla., Hugh Latimer, Bergson, Brokland, Margolis & Adler, Kirkland, Ellis & Rowe, Washington, D. C., S. M. Clark, Akron, Ohio, Alvin K. Hellerstein, Strook & Strook & Lavan, New York City, Walton, Lantaff, Schroeder, Carson & Wahl, Laurence A. Schroeder, Mershon, Sawyer, Johnston, Donwody & Cole, Aubrey V. Kendall, Miami, Fla., Swan, Keeney, Jenckes & Asquith, Harry W. Asquith, Providence, R. I., Robert G. Lubbers, Andrews, Lubbers & Obrig, Robert F. Conrad, Fort Lauderdale, Fla., Frederick C. Tecce, Cuniff, Bray & McAleese, Plymouth Meeting, Pa., Michael J. Striker, Striker, Striker, Contler & Stenby, New York City, Daniel Neal Heller, Heller & Kaplan, Daniel Neal Retter, Miami, Fla., Ralph C. Nelson, Hialeah, Fla., Davis W. Duke, Jr., McCune, Hiaasen, Crum, Ferris & Gardner, Fort Lauderdale, Fla., Seymour D. Lewis, Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, Blum, Moscovitz, Friedman & Kaplan, New York City, John F. Leviness, III, Otterbourg, Steindler, Houston & Rosen, New York City, Stanley Arthur Beiley, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Smathers & Thompson, Bradford, Williams, McKay, Kimbrell, Hamann & Jennings, Charles A. Kimbrell, Miami, Fla.

ATKINS, District Judge.

During the pendency of discovery proceedings in these 51 actions consolidated in the United States District Court for the Southern District of Florida, certain summary judgment motions have been filed and briefed by various parties opposing the patents here in suit. Following the conclusion of the bulk of the discovery in December 1973, the patentee parties were requested to respond to those motions in an attempt to decide them in an orderly fashion before a final trial date is set. The responses so requested have been filed with the Court and between April 11 and April 18 the Court has heard some twelve hours of argument on the various motions. The time for decision has arrived and this Order will attempt to set forth the Court's rulings and reasonings in a brief, but hopefully adequate fashion. The history of this litigation has previously been discussed by the Judicial Panel on Multidistrict Litigation in its opinion ordering the transfer, *In Re Yarn Processing Patent Validity Litigation*, 341 F.Supp. 376 (Jud.Pan.Mult. Lit.1972), and in this Court's orders published at 360 F.Supp. 74 (S.D.Fla. 1973) and 56 F.R.D. 648 (S.D.Fla.1972). To the extent the background information contained therein is helpful to an understanding of this Order, they are incorporated by reference. Additionally, the Court reviewed the law relating to Rule 56 of the Federal Rules of Civil Procedure before rendering a summary judgment of invalidity of the single heater patents *In Re Yarn Processing Patent Validity Litigation*, 360 F.Supp. 74, 78–79 (S.D.Fla.1973), and that law is equally applicable here and need not be repeated. The motions will be discussed below in the order in which they were argued, although that order might not necessarily be the most logical.

I

*Celanese and FII Motion for Partial Summary Judgment that Double Heater Patents 3,077,224, 3,091,912 and 3,472,011 are Unenforceable in the Hand of Defendant Lex-Tex*

This motion seeking dismissal of the patent owner Lex-Tex's counterclaims for infringement against Celanese and FII was filed on November 26, 1973 in

case number 71–1026–CIV–CA, a part of MDL 82. On December 3, 1973, Sauquoit and Rohm & Haas, defendants in case under 72–938–CIV–CA, joined in the Celanese motion to the extent that it sought a declaration that the '912 patent was unenforceable; all of the Celanese pleadings relating to this motion were adopted in that joinder.

The motion as filed relies on Section 7 of The Clayton Act, 15 U.S.C.A., § 18, which provides in part:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Lex-Tex, pursuant to a transfer from Leesona Corporation, acquired the '912 and '724 patents in 1967. In June of 1971 Lex-Tex acquired from Ernest Scragg & Sons, Ltd., of England, the United States Patent No. 3,472,011.[1] All three of these patents were described in the Agreement of June 16, 1971 as "relating . . . to machines, apparatus and methods for the production of modified torque stretch yarn."

It is the contention of Celanese that the acquisition of the '011 patent by Lex-Tex, a corporation engaged in commerce and subject to the jurisdiction of the FTC, 15 U.S.C.A., § 21, was the acquisition of "any part of the assets [patents] of another corporation engaged also in commerce [Scragg]" that had as a necessary effect the lessening of competition "in any line of commerce [licensing of the three double heater patents]" "in any section of the country [the entire United States]." Thirteen material facts are recited in the moving papers, with the assertion that they are not in dispute. Only fact number four is really in dispute and that is because it alleges that an important purpose of the acquisition of the '011 "was to significantly lessen competition between that patent" and the '912 and '724 patents. As stated, the question is factual, but immaterial. The statute is concerned with the result of the acquisition, not the purpose. If the purpose was to substantially lessen competition, but no possibility of such a lessening existed, the statute would not be violated.

Lex-Tex, in resisting the granting of the motion, recites two facts that are allegedly material and evidently in dispute. Only the first need concern the court here.[2]

### LEX–TEX FACT NO. 1

There never was any possibility of a competitive licensing program between Lex-Tex and Scragg as to '912, '724 and '011

This material fact in dispute derives from the Lex-Tex assertion that the '011 patent on the one hand and the '912 and '724 patents on the other are blocking, or complementary, patents. A definition of "blocking" patents was provided by the Supreme Court in *Standard Oil Co. v. United States*, 283 U.S. 163, 171, 51 S.Ct. 421, 424, 75 L.Ed. 926 (1931):

> . . . An interchange of patent rights and a division of royalties ac-

---

1. For the purpose of deciding this motion it will be assumed that the '011 patent was owned by Ernest Scragg & Sons, Ltd., because Lex-Tex has not contended otherwise. However, on the face of the Agreement it provides that "Ernest Philips (illegible) Scragg is the owner of" the '011 patent.

2. The second fact states that the three patents are licensed to the trade independently

or jointly, depending on wishes of the licensee. This fact might be material if Celanese was alleging a tying violation of Section 1 of the Sherman Act, 15 U.S.C.A., § 1, which, of course, it is not. Unfortunately, the bulk of the Lex-Tex brief addresses itself to the Sherman Act and its application to these facts—a non-existent issue.

cording to the value attributed by the parties to their respective patent claims is frequently necessary if technical advancement is not to be *blocked* by *threatened* litigation.[5]

5. This is often the case where patents covering improvements of a basic process, owned by one manufacturer, are granted to another. A patent may be rendered quite useless, *or "blocked"*, by another unexpired patent which covers a vitally related feature of the manufacturing process. . . . (emphasis supplied) [3]

If the patents could be considered "blocking" within the meaning of this definition, Lex-Tex argues, there could be no competition under Clayton Act section 7 to be lessened by the acquisition.

No authority has been cited by either party to this motion in an effort to show whether the classifying of several patents as either competing or blocking is a factual determination. After this question was posed by the Court, Celanese took the position in oral argument that if the determination was factual, the Agreement between Lex-Tex and Scragg virtually admitted that the two would have been competitors in the licensing of double-heater technology— why else would Lex-Tex agree to a rebate of 12½% of the royalties?[4] That deduction is too facile and does not necessarily follow. If that reasoning were correct, the only blocking patents would be those that were given away by their owners. Celanese has also argued that if the categorization of the three patents as blocking required a factual decision, Lex-Tex has failed to show any underlying facts that support its position that the patents were, and are, blocking. An affidavit of Nicholas J. Stoddard, one of the Permatwist partners, was relied on by Lex-Tex for the proposition that "the operation of any of these machines [Leesona, ARCT, Barmag and Scragg] to produce a set yarn would infringe claims of each of '724, '912 and '011." Paragraph 27 of that affidavit stated: " '912, '724 and '011 are complimentary [sic] blocking patents." This affidavit was attacked on several grounds under Rule 56, and Celanese feels that it should not be used for any purpose.

Counsel for Lex-Tex argued that a decision relating to the blocking or competitive character of several patents was factual in nature and should not be decided on summary judgment. No case law was cited to support this conclusion however, Nevertheless, it is clear that summary judgment should only be granted when the material facts are not in dispute *and* the moving party is entitled to judgment as a matter of law. Even if the characterization of the relevant patents as blocking or competing presents only a question of law, and this is by no means sure at this point, the Court does not feel competent on this record to make that decision. The one affidavit submitted with these pleadings only makes the statement in the most general way without even elucidating the underlying premises for the affiant's conclusion that the patents are "blocking."

This motion has served a useful purpose, despite the necessity for its being denied at this point. The Court is convinced that the only issue truly in dispute is the question of whether the patents are blocking or competing. If they are determined to be competing, whether by the finder of fact or the Court, as the case may be, the tendency to lessen competition in the relevant line of commerce appears to be established

3. Another definition of a "blocking" patent is contained in *International Manufacturing Co. v. Landon, Inc.*, 336 F.2d 723, 731 (9 Cir. 1964), *cert. denied*, 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965):
. . . . If we had a case where a licensee could produce a commercially acceptable product utilizing one patent but not infringing the others in the package, then clearly we would not have a case involving blocking patents.

4. Hearing on Motions for Summary Judgment, April 11, 1974, at p. 8.

per force by the fact that the assets involved are patents—by definition a monopoly.[5]

## II

*Celanese and FII Motion for Partial Summary Judgment Dismissing the Lex-Tex Counterclaim for Infringement of Patent 3,091,912*

As with the earlier motion, this request for a partial summary judgment was filed by Celanese in case number 71–1026–CIV–CA on November 26, 1973. Twenty-six material facts are recited by Celanese to support the granting of this motion, and Lex-Tex has, in one form or another, denied twelve of those facts. In addition, Lex-Tex has raised a possible fact question relating to the intention of the parties.

To summarize briefly, Celanese argues in its motion that an interference was declared in the Patent Office between one of its patent applications and the Leesona patent 2,864,229. In order to resolve the interference quickly, the parties entered into an agreement that provided for a determination of invention priority by counsel, with the loser stipulating to an abandonment of the conflicting claims. Celanese prevailed, and Leesona disclaimed the portions of the '229 patent that were the subject of the interference. Additionally, in the second article of the agreement Leesona granted to Celanese a royalty free, irrevocable, non-exclusive license to three categories of claims:

1. The claims which comprised the counts of the interference;

2. Any patentable claim that is supported by both the patent ('299) and the application, and made in at least one; and

3. Claims of any other patent which Leesona presently has licensing rights or which may be granted in any patent based on inventions reduced to writing insofar as such claims would restrict the right of Celanese to utilize the inventions which are covered by the above two categories.

Lex-Tex in this action has asserted by way of counterclaim that the operation by Celanese of the Barmag machine infringes its patent number 3,091,912. Celanese, after noting that the '912 patent derives from an application filed by Leesona before the date of the agreement above, urges that because (1) the inventor has previously acknowledged that the sole patentable disclosure in claim 1 of the '229 patent is the spaced guide means employed above and below the heater and (2) that claim was part of the interference, it has, under the first portion of the agreement, a royalty free license to practice the use of the spaced guide means used above and below the heater. The '912 patent should not be asserted against Celanese, it is argued, because the third portion of the agreement prevents the use of the '912 patent to restrict the right of Celanese to use the invention disclosed in claim 1 of the '229 patent, to wit: the spaced guide means.

Celanese also advances the contention that the second portion of the agreement

---

5. Lex-Tex raised two issues that should be mentioned in passing. The assertion that the misuse claim by Celanese should not be heard by the Court becaused it has previously been waived is not presuasive. The pleadings support the contention, and that is that. Also, Lex-Tex should be advised not to waste time advancing its argument that the acquisition of the '011 patent was in fact procompetitive.

. . . because there in one hand was [sic] all patents which affected this indus-

try . . . and the opportunity [was] there for the industry at large to come to one person who had the disc package and know that they could undertake production without concern for being sued for infringing patents.

As the Supreme Court said in *United States v. Masonite Corp.*, 316 U.S. 265, 281, 62 S. Ct. 1070, 1079, 86 L.Ed. 1461 (1942), "[i]t is outside our competence to inquire whether the result was or was not beneficent or whether the evil was or was not realized."

summarized above also applies to these facts to prevent the assertion of the '912 patent against its use of the Barmag machines. The '229 patent, in lines 35 to 40 of column 2, incorporates the disclosure of the '912 patent (then application number 653,953). Because the third claim of the Celanese '552 patent (the patent resulting from a continuation-in-part application of the original application that was the subject matter of the interference) is practiced on the Barmag machines, and the inventive aspect of that claim is supported by both claim 3 of the '552 patent and the '912 patent,[6] and claimed by the '912 patent,[7] the practicing of claim 3 of the '552 patent on the Barmag machine is immune from attack by Lex-Tex on the basis of '912 infringement. The third portion of the agreement provides for as much.

Lex-Tex in the opposition memorandum has challenged two facts posited by Celanese on the ground that the testimonial matter relied on is incompetent. As to others, it has relied (1) on the fact that the '229 patent disclosed an invention that consisted of a down twister that used spaced guide means, and that therefore only a down twister was meant to be covered by the agreement, and (2) on the argument that the third claim of the '552 patent is not supported by the '229 patent. Accordingly, we have the two grounds of the Celanese motion resisted as follows:

(1) As to the Celanese contention that it is to have royalty free use of the invention in claim 1 of the '229 patent (the spaced guide means), Lex-Tex agrees, but only insofar as they are used on a down twister machine. The Barmag machine is a false twister and not a down twister; and

(2) The argument by Celanese that the Barmag machine practices claim 3 of the '552 patent, a claim that is supported by the '552 patent and the '229 patent (with '912 incorporated by reference) and claimed by the '912 patent, is challenged on the ground that the '229 patent does not support the claim.

A. As to the first objection, a decision must be made as to whether the agreement in granting a "royalty free . . . license under the claims which compose the counts of the interference" contemplated the spaced guide means independently, since they were the only new aspect of the first claim in '552, or whether the claim covered only spaced guide means used in conjunction with a down twister. Lex-Tex countered the contention that the spaced guide means were in essence the "invention" of claim 1 of the '229 patent merely by arguing that Mr. Seem's testimony to that effect quoted by Celanese was incompetent. This, of course, is not a proper objection in this context. Either Mr. Seem said what was quoted in fact 9.1 or he didn't. It is the interpretation of the meaning of that quote that should be argued by Lex-Tex in the memorandum, but that was not done. For the purposes of this motion, then, the Court will assume that the quote contained in fact 9.1 is accurate. That still leaves us with the need to interpret it. Mr. Conrad argued in the hearing that claim 1 of the '229 patent must be construed to include the use of down twister with the spaced guide means.

The claim in question as your Honor will recognize from reading it is a combining claim. And the fact that Mr. Seem added one element to make the new combination, which is the subject matter of the claim, doesn't mean that the claim is dependent or that that claim really covers, as our

---

6. Lex-Tex asserts infringement and must therefore concede coverage. The incorporation of the '912 patent by reference into the '229 patent brings this motion in the preview of the second portion of the agreement.

7. Obviously the use of the Barmag machine in a way that would otherwise infringe the '912 patent must be claimed by that patent.

opponent suggests, just the feature which the inventor added to the prior art combination. The subject matter of the claim is, of course, the complete combination set forth in the claim.

Now this is true even in any case where the inventor assembles old parts to make a new combination. For example, it is perfectly clear that Claim One could not be asserted against any party who is simply using spaced guide means on either side of a heater, in, for example, a machine such as up-twisters, which is a machine that is the basic character of the false twist equipment. That claim could not be asserted against spaced guide means on either side of the heater on an up-twister. Claim I and other claims which were in the interference are all specifically limited to arrangements on down-twisters. And the language of the claim makes that perfectly clear.

For example, if you look at the language of Claim I you see reference to a flier in combination with the take-up mechanism called the twister spindle.

Now that particular bit of mechanism, as anyone who is familiar with the technical machinery knows, is something that is only associated with the kind of a take-up mechanism one has on a down-spinner or a down-twister.

Now, since the claims in the interference were all limited to that kind of a machine, that is a machine which involved the down-twister elements in combination with the heater and spaced guide means, those claims are not relevant to anything which Celanese or FII are now doing. For example, these features of the claims make it clear that Celanese in operating its present equipment is not operating under the X-type of claim of

'229 patent. Because there are not twister spindles on the Barmag machines now being operated by Celanese and FII. There are no fliers associated with the take-up mechanism. All is specified in Claim I of that patent.[8]

The response of Celanese to this contention was to refer to yet another instance when Leesona contended in prior litigation that the guide means were "the sole feature of the claim combination which the patentee contributed to the prior act."[9] This is exactly what Mr. Seem was quoted as having admitted in fact 9.1 and Lex-Tex announced it does not dispute the statement,[10] only its interpretation. The question that must be answered is whether the granting of a royalty free license to practice a combination invention that combines other articles old in the art with one new item includes the use of the new item used separately or only the combination used as a whole? The Court has been directed to no case law that would provide an answer to that question. Logically it would seem that if the user of the new item (i. e., the spaced guide means) employed it outside the context of the combination, and he could be held to have infringed the combination patent by that use, then the license should also be construed to cover the new item so employed. If the coverage under the license is found, then the agreement here by its own items prevents the assertion of the '912 patent against Celanese in a way which would restrict the right of Celanese "to utilize the inventions which constitute the subject matter of the claims which comprise the counts of the interference . . . ."

Conversely, if a combination that combines articles old in the art with one new item is patented, and the use of the new item out of the context of the combination would not be held to infringe that combination patent, then

8. Hearing on Motions for Summary Judgment, April 11, 1974, at 61–66.

9. *Id.* at 72.

10. *Id.* at 61.

the license granted under that combination patent would not necessarily include the use of the new item so employed. If the license did not cover the use of that item alone, then the agreement entered into between Celanese and Leesona would provide no protection to Celanese for the operation of a machine that would otherwise infringe the '912 patent, despite the fact that the machine also uses the new item (i. e., spaced guide means) as an incident to its operation.

The answer to the question posed above is expressly answered by the Supreme Court in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273 (1972), *rehearing denied*, 409 U.S. 902, 93 S.Ct. 94, 34 L.Ed.2d 165:

> We cannot endorse the view that the "substantial manufacture of the constituent parts of [a] machine" constitutes direct infringement when we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts. "For as we pointed out in *Mercoid v. Mid-Continent Investment Co.* [320 U.S. 661, 676, 64 S.Ct. 268, 276, 88 L.Ed. 376] a patent on a combination is a patent on the assembled or functioning whole, not on the separate parts." *Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 684, 64 S.Ct. 278, 280, 88 L.Ed. 396 (1944). See also *Leeds & Catlin Co. v. Victor Talking Machine Co.*, 213 U.S. 301, 29 S. Ct. 495, 53 L.Ed. 805:

> > "A combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But whether new or old, the combination is a means—an invention—distinct from them." *Id.*, at 318, 29 S.Ct., at 500.

> > . . . . . .

> > "[O]ne element is not the combination. Indeed, all of the elements are not. To be that—to be identical with the invention of the combination—they must be united by the same operative law." *Id.*, at 320, 29 S.Ct., at 501.

*And see Brown v. Guild*, 23 Wall. 181 [90 U.S. 181], 23 L.Ed. 161 (1874). In sum,

> "[i]f anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. [336], at 344, 81 S.Ct. [599], at 604 [5 L.Ed.2d 592].

In view of the fact that the user of one item of the combination would not be considered an infringer of the patent, a license granted under a combination patent would not necessarily include the independent use of that one item. That being the case, the assertion by Leesona of the '912 patent against Celanese for the operation of the Barmag machine that employs one item of the conbination patent cannot be construed as restricting the utilization of the combination license. As to that ground, the motion for partial summary judgment must be denied.

B. As the second ground for granting this motion, Celanese has arged that:

(1) The Barmag machine practices claim 3 of the '552 patent;

(2) Claim 3 of the '552 patent is supported by both application 376,434 and the '229 patent (as it incorporates the '912 patent);

(3) The use of the Barmag machines is claimed by the '229 patent (as it incorporates the '912 patent),

thereby allowing it a royalty free license to use the Barmag machines based on the second portion of Article II of the agreement. In order to prevail on this argument Celanese has supported point 1 in its fact 10, point 2 in facts 10.1, 10.1.2 and 10.2 and point 3 in fact 10.2.-1.

In response to this methodical attack, Lex-Tex denied fact 10 based on a mistaken assumption as to what it

purports to state; denied fact 10.1 because the supporting documents were not attached to the moving papers; denied fact 10.1.2 on the basis that the document being interpreted speaks for itself; alleged that fact 10.2 is immaterial, irrelevant and incompetent; and construed fact 10.2.1 as a *non sequitur*. The weak links in the chain of logic fashioned by Celanese in this part of the motion are:

1) The statement that the Barmag machine practices claim 3 of the '552 patent; and

2) The statement that the process defined by claim 3 of the '552 patent is claimed in the '229 patent.

As to the first point, fact 10 alleged precisely that, but Lex-Tex denied that fact while apparently under the impression it said something else. In oral argument Mr. Conrad, an owner of Lex-Tex, stated that

. . . it is far from clear, certainly from anything in this record, and as a matter of fact, that the Barmag machine presently operated by Celanese and FII, are in fact covered by Claim III of the '552 patent.[11]

Mr. Irons' response was to the point:

The final paragraph of the affidavit of Mr. Schaeffer, which is unchallenged, says that[;] it uses the language of Claim III. . . . there is an unchallenged affidavit showing on personal knowledge in my opening papers which shows just that.[12]

Even the affidavit of Mr. Stoddard does not refer to this fact, so based on the Schaeffer affidavit it will be deemed established.

As to the assertion that the process defined by Claim 3 of the '552 patent is supported by the '229 patent, Celanese relies on those cases which hold that "the disclosure in a patent application may be deliberately supplemented or completed by reference . . . to disclosure in earlier or concurrently filed copending applications." *Application of Lund*, 376 F.2d 982, 989, 54 C.C.P.A. 1361 (1967).

. . . As the expression itself implies, the purpose of "incorporation by reference" is to make one document become a part of another document by referring to the former in the latter in such a manner that it is apparent that the cited document is part of the referencing document as [if] it were fully set out therein.

376 F.2d at 989. It will be recalled that Lex-Tex made no specific denial of the effect of such incorporation, but only noted that the document would speak for itself. Had it wanted to, Lex-Tex could have cited *Lund* for the proposition that "the court . . . did not intend to imply that *any* manner of reference to an earlier application was sufficient to incorporate the entire disclosure or any part thereof by reference into the patent." 376 F.2d at 990. Although the Court in *Lund* held that the mere reference to an abandoned application from which the present application was a continuation-in-part was "not sufficient to incorporate the description of his earlier application into the patent," the '229 patent contains much more. Lines 35–40 in column 2 read as follows:

. . . The invention has particular utility in practicing the methods disclosed in the copending U.S. patent applications of Stoddard and Seem, Serial Number 401,803, filed January 4, 1954, now Patent Number 2,803,108, and Serial Number 653,953, filed April 19, 1957. [Now Patent 3,091,912].

It is the Court's opinion that no factual analysis is necessary—as a matter of law the '229 patent incorporates the disclosure of the '912 patent. Accordingly, the '229 patent as read supports the third claim of the '552 patent. All the other premises necessary to justify the

---

11. *Id.* at 63.

12. *Id.* at 70.

granting of a summary judgment having been complied with, the motion is granted.[13]

## III

*New York Throwsters Motion for Summary Judgment that Leesona's Manufacturing License Agreements Violated Sections 1 and 2 of the Sherman Act, that Treble Damages are Appropriate, and that the Single Heater and Spindle Patents Have Been Misused*

The New York Throwsters filed this summary judgment motion on November 28, 1973 on behalf of the twenty-four consolidated cases transferred to this Court from the Eastern District of New York in which they are the plaintiffs, as well as the one case from the same jurisdiction in which they are the defendants. As the title above indicates, it challenges the continuing enforceability of the three single heater patents ('105, '108 and '109) and the three high speed Hilbert spindle patents ('086, '247 and '218), as well as the legality, on antitrust grounds, of certain manufacturing licenses entered into between Leesona and other texturizing machinery manufacturers. This motion is supplemented by a motion from Universal Textured Yarns, filed in case number 72–556–Civ–CA on December 6, 1973, challenging in addition the enforceability of the double heater patents ('724, '912 and '011). Celanese and FII earlier moved in case 71–1026–Civ–CA for a partial summary judgment (1) declaring illegal under the Sherman Act certain agreements between Permatwist and Leesona, entered into in 1954, 1958 and 1960; and (2) holding that the patents subject to the provisions of those agreements to be unenforceable, to wit: the single heater patents, the high speed Hilbert spindle patents, and two of the double heater patents ('724 and '912).

As an additional matter of interest, the New York Throwsters motion has been adopted by Celanese in case 71–1026–Civ–CA (adding the '724 and '912 double heater patents) together with Sauquoit and Rohm & Haas in case numbers 72–563–Civ–CA and 72–938–Civ–CA (adding the '912 double heater patent). The Universal Textured Yarns' motion was also joined in by Sauquoit and Rohm & Haas in case numbers 72–563–Civ–CA and 72–938–Civ–CA, as well as by Concordia Manufacturing in case number 71–84–Civ–CA. The Celanese motion was joined in by Sauquoit and Rohm & Haas, Concordia Manufacturing and Universal Textured Yarns. Unfortunately, the memoranda submitted by the various parties to these interrelated motions are quite voluminous and cannot be discussed in depth in this Order without its exceeding reasonable limits. Because this situation exists, reliance will be placed where appropriate on the memoranda themselves without any attempt to recapitulate or summarize their contents. The New York Throwsters motion will be dealt with first and, as and where they dictate, the supplemental motions will be discussed.

Each of these motions listed above seek, *inter alia*, to have the Leesona single heater patents declared unenforceable. This Court has previously ruled that those three patents are invalid because of a violation of the provisions of § 102(b) of Title 35, United States Code. *In re Yarn Processing Patent Validity Litigation*, 360 F.Supp. 74 (S.D.Fla. 1973). In view of the fact that that Order has been appealed to the Fifth Circuit Court of Appeals, and because that determination is not necessary to a decision on these motions, for the purposes of this decision the Order invalidating the single heater patents will not be considered to have been entered.

The New York Throwsters motion recited 48 facts which it considered mate-

---

13. The reliance by Lex-Tex on a factual dispute as to the intention of the parties to the agreement is misplaced. The intention of the parties has been determined from words of the agreement itself.

rial and undisputed. Leesona, in its memorandum in opposition to the motion, has disputed outright certain of those facts and disputed other facts only as worded by the movants. After an analysis of those facts together with Leesona's forthright responses, the Court considers the following facts to have been established and agreed to for the purposes of this motion:

1. The 1954 agreement between Leesona and Permatwist provided that the Leesona Model No. 550 machine would be sold by Leesona "only when accompanied by a royalty-free limited license to use the said machines and attachments for the production of crimped, fluffed and wavy nylon yarn."

2. A 1954 Leesona memorandum reflects that *a* purpose for this provision was as follows: "It is understood that this is for the protection of the customer and also protects Universal against future contesting of our patents by our customers."

3. Permatwist, on December 1, 1955, advised Leesona that it was "opposed to sell J. P. Stevens [a throwster] 550 machine on a basis that [would] permit them to contest the validity of patents [sic] claims which might issue covering crimped, fluffed or wavy yarns." By a letter of December 5, 1955 Leesona acquiesced and agreed to insert such a provision.

4. Leesona's sales agents were instructed that license agreements were to be signed by all purchasers of Leesona's Model No. 550 machinery, and that this matter was "very important" to Leesona's patent rights.

5. Leesona concluded at least fourteen manufacturing license agreements with sellers of false twist machinery, some of whom had never sold such machinery in the United States, and others of whom were licensed only after infringement litigation was initiated against them.

6. At least three of these manufacturing license agreements contain af-firmative convenants not to contest the validity of Leesona's patents.

7. One of the "intended functions" of the assignment of the post-treating patents to Lex-Tex in 1967 was "to insulate Leesona and Leesona's stretch yarn program from being involved in any post treating litigation" that Lex-Tex might bring.

8. The 1954 agreement between Leesona and Permatwist required Leesona to permit other manufacturers of textile machines to sell false twist machinery "provided said manufacturers agree that purchasers of said machines . . . shall first secure a license agreement."

9. The agreement between Leesona and Permatwist dated October 17, 1958, which related to the exploitation of Leesona's high speed spindle, contemplated the division of royalties with other manufacturers of high speed spindles. The fundamental purpose of this agreement was set forth in a letter by Leesona patent counsel, A. P. Davis, to William Fuchs: "The basis for this offer is that they would be doing us a service by supplying our licensees with equipment which would earn a royalty for us."

10. The agreement between Leesona and Heberlein dated October 1, 1958, relating to the exploitation of Leesona's high speed spindle, contemplated the possible division of royalties with other manufacturers of high speed spindles, and allocated the burden of such payments as follows: Leesona—85%; Heberlein—15%.

11. Heberlein participated in the negotiation of its manufacturing license agreement with Leesona dated April 1, 1962, although the basic terms of the manufacturers licenses had been decided by Permatwist and Leesona as early as October, 1958.

12. The manufacturing license agreement between Leesona and Heberlein dated April 1, 1962 contained a most favored nations clause which contemplated the grant of additional manufacturing license agreements by Leesona, in sub-

stantially similar form. Each subsequent manufacturing license agreement issued by Leesona contained a similar most favored nations clause. See fact 11.

13. The fact that Heberlein would sell false twist machinery to throwsters who executed the Leesona production royalty license was publicized throughout the trade.

14. Leesona represented to its manufacturing licensees and potential manufacturing licensees that it had "decided some years ago to license all machinery manufacturers under our standard arrangement."

15. Throwsters proposed fact is denied.

16. After an inquiry by Berliner, a machinery manufacturer in Europe, Leesona explained to Mr. Dufort of Scragg:

"It goes without saying that we are no different from any other manufacturer and do not welcome competition. However, we decided some years ago to license all machinery manufacturers, under our standard arrangement, who want to sell in the United States and Canada. It is also clear that all of us will be better off if Berliner enters into this market as a licensee.

17. Throwsters proposed fact is denied.

18. In 1954, before Leesona's acquisition of the single heater patents, Leesona's sales agents were authorized to represent that Leesona would "agree to defend at our expense any infringement suit brought" by Permatwist, although Leesona was "not ready to guarantee to indemnify" clients for infringement damages.

19. Throwsters proposed fact is denied.

20. Throwsters proposed fact is denied.

21. Leesona settled its litigation with Southern Silk Mills on terms which included the transfer of a royalty-free license to operate false twist machinery.

One of the reasons this was done was because Leesona was involved in other litigation and did not feel that Southern's homemade machines posed any substantial competitive risk.

22. Throwster proposed fact is immaterial to this motion.

23. Each of Leesona's manufacturing license agreements authorizes sales only to throwsters who have been licensed by Leesona. Had this provision not been included, the purchaser of a machine from a licensed manufacturer might be said to have acquired an implied royalty free license to use the machine as it was intended to be used.

24. Each of Leesona's manufacturing license agreements provides that Leesona may terminate the license if sales are made to unlicensed throwsters.

25. At least one of Leesona's manufacturing license agreements contains an affirmative statement by the manufacturing licensee that it will not deliver false twist machinery to any throwster who has not executed the Leesona license; Leesona was to communicate the fact of licensing to that spindle manufacturer.

26. Each of Leesona's manufacturing license agreements provides that one-third of the production royalties collected by virtue of the operation by throwsters of the competitor's false twist machinery will be returned to the manufacturing licensee. The licenses themselves contain a provision explaining Leesona's reasoning in this regard and for purposes of brevity that provision is incorporated herein by reference.

27. Of Leesona's manufacturing licensees, only Heberlein and Klinger contributed patents or technology to Leesona. The agreements transferring patent rights to Leesona were arrived at independently of the manufacturing license.

28. With respect to Heberlein, Leesona agreed to make separate payments for the patents contributed. These arrangements are contained in agreements

dated April 27, 1955 and October 1, 1958.

29. With respect to Klinger, the patent was licensed to Leesona in a separate instrument, and the one-third royalty rebate was not affected.

30. Under the terms of the manufacturing license agreements, the licensees were expressly precluded from having any say in the royalty rates and terms of the license granted to the purchaser of the licensee's false twist machinery.

31. Pursuant to the Permatwist-Leesona agreements, which could not be interfered with by these manufacturing licensee agreements, throwsters purchasing machinery sold by Leesona's manufacturing licensees were required to execute a license which provided for the payment of production royalties of six cents per pound of yarn textured on a 70 denier basis.

32. In the agreement between Leesona and Permatwist dated October 17, 1958, the level of these production royalties was fixed.

33. In the agreement between Leesona and Heberlein dated October 1, 1958, Heberlien consented to a reduction of the amount of the royalties to be paid it by Leesona. This consent was necessary in order to allow Leesona and Permatwist to renegotiate the per pound royalty on yarn processed on the high speed spindles.

34. In 1958, Leesona refused to sell its own high speed false twist spindles to throwsters who would not agree to accept the production royalty license.

35. In 1958, Leesona initiated a series of law suits, based on both the false twist patents and the Hilbert spindle patents, against both purchasers and sellers of high speed false twist machinery and spindles. None of these litigations resulted in an adjudication of the validity of Leesona's United States patents on the merits. However, in its action against Scragg on its Canadian patents Leesona was successful. In litigation against Joe Smith, Inc., in the Unit-

ed States the defendant acknowledged the validity of the patents on the eve of trial and accepted a license.

36. By the time these actions were initiated in 1969, royalties collected by Leesona for the operation of machinery sold when the production royalty was initiated in 1958, amounted to between two and six times the initial selling price of that machinery.

37. Leesona's former president has testified that "The price of our machinery has always been a combination of machine price and royalty," and that "Royalties are price, it seems to me."

38. Throwster proposed fact denied as conclusory.

39. Throwster proposed fact denied.

40. The agreement between Leesona and Permatwist dated December 14, 1954, required that all improvements "made or acquired" by Leesona would be exploited according to the terms of the agreement. The agreement between Leesona and Permatwist dated October 1, 1958, was in form a modification of the December 14, 1954 agreement occasioned by Leesona's "application for a patent on a High Speed Spindle."

41. By virtue of its April 27, 1955 and October 1, 1958 agreements with Heberlein, Leesona acquired rights under a number of Heberlein patents.

42. By virtue of its agreements with the Deering-Milliken group, dated March 31, 1964, Leesona acquired rights under a number of Deering-Milliken patents.

43. Leesona maintained royalty reports or summaries which were prepared on a quarterly basis under the supervision of Robert H. Wallace, the manager of its Market Research and Product Planning Department. The information for these reports was derived from royalty reports submitted by Leesona's licensees. In order to complete the report Leesona estimated the yarn production on the ARCT machinery as well.

44. These quarterly royalty reports were considered by Leesona to be accurate except insofar as inaccuracy may

have arisen from inaccurate reports by the licensees or inaccurate estimates of ARCT production, and were relied upon by Leesona's executives in making business decisions.

45. According to these records, Leesona's percentage shares of the market for the licensing of false twist texturing operations in the United States for the sixteen quarterly periods immediately preceding the institution of this litigation were as follows:

Second Quarter 1969 — 74.73%
First Quarter 1969 — 74.73%
Fourth Quarter 1968 — 75.20%
Third Quarter 1968 — 74.70%
Second Quarter 1968 — 74.20%
First Quarter 1968 — 73.2%
Fourth Quarter 1967 — 72.6%
Third Quarter 1967 — 72.1%
Second Quarter 1967 — 73.5%
First Quarter 1967 — 74.9%
Fourth Quarter 1966 — 74.5%
Third Quarter 1966 — 72.9%
Second Quarter 1966 — 75.0%
First Quarter 1966 — 76.0%
Fourth Quarter 1965 — 78.7%
Third Quarter 1965 — 80.1%

Additionally, a survey of Leesona's royalty reports indicates that during this relevant time period more than 85 per cent of the royalties received by Leesona were paid on Leesona machinery. Less than 15 per cent of the false twist royalties received by Leesona were from yarn processed on machinery manufactured by, or reconstructed with spindles from, the machinery manufacturing licensees.

46. New York throwsters have paid production royalties to Leesona, pursuant to the terms of their existing agreements, during the four-year period immediately preceding the institution of this litigation.

47. Both Leesona's false twist (single heater) patents and the high speed spindle patents were licensed to various throwsters who used false twist machinery produced by Leesona or its machinery manufacturing licensees.

48. Throwster proposed fact denied as conclusory.

It has been possible to arrive at these undisputed facts, some of which may or may not be material, by reviewing the response provided by Leesona in accordance with Local Rule 10(J)(2). Where Leesona has indicated that a dispute exists because of the use of certain terminology, or where the deletion and/or inclusion of certain material is complained of, the proposed fact has been reworded to incorporate Leesona's proposed wording. This has been done on the theory that Leesona's counsel would not have proposed the additional material or alternate wording unless they were prepared, on behalf of their client, to agree to the fact as modified. Leesona in its memorandum did not, in a concise statement, list any additional "material facts as to which it is contended that there exists a genuine issue to be tried," so the motion should be granted or denied on the facts as set forth above.

It has been the New York Throwsters' contention throughout that these facts disclose

(1) An overall combination or conspiracy in restraint of trade that violated Section 1 of the Sherman Act,

(2) The individual elements of which include the per se antitrust violations of

(a) concerted regulation of distribution and the boycotting of trade channels,

(b) division of profits among competitors, and

(c) price fixing;

(3) With the result being an overall scheme to monopolize the manufacture of false twist machinery, and an actual achievement of that monopoly goal.

It is these alleged antitrust violations, they argue, that directly injured them

and for which injuries they should receive treble damages. They argue almost incidentally that because these antitrust violations have been shown, the New York Throwsters are entitled to an injunction against the continuation of these practices and a declaration that the patents involved in the scheme have been misused and are hence unenforceable.[14]

Leesona has countered these arguments by assenting that the undisputed material facts

(1) Fail to disclose that Leesona was a party to a conspiracy, that there was any inhibition to the challenge of the patents, that there was an unreasonable restraint of trade, or that the Throwsters were proximately injured;

(2) Show that the legal theory of antitrust law relied on is inapplicable and that the measure of damages requested is improper;

(3) Illustrate that the licensing arrangements with the machinery manufacturers do not amount to an unreasonable restraint, profit sharing, price fixing, or illegal monopolization; and

(4) Conclusively demonstrate the Throwsters claims are barred by the statute of limitations, laches, and estoppel.

As to one of the last aspects of the Throwsters motion, Leesona notes that if no antitrust violations have been shown, no right to an injunction exists. It is also Leesona's position that if antitrust violations have not been shown, the misuse claim fails.[15]

Mindful always of the caveat that "[s]ummary judgment is the rare exception, *see Ronel Corporation v. Anchor Lock of Florida, Inc.*, 5 Cir. 1963, 325 F.2d 889, and not the rule in patent infringement cases," *Ag Pro, Inc. v. Sakraida*, 437 F.2d 99 (5th Cir. 1971), the Court nevertheless agrees with the Throwsters contention that:

. . . Thus, in the main, there is no genuine issue as to these key material facts, and the only question before the Court is whether we are entitled to judgment as a matter of law. In other words, the important issue of the antitrust legality of Leesona's licensing program is now ripe for summary judgment.[16]

If a trial were held in this, or the New York Court the parties agree that the facts adduced would be the same as those previously listed above. Therefore the facts as agreed to by the parties either do or do not support the Throwsters' position.

■ It is the Court opinion that they do, at least in part, support the throwsters motion and accordingly, it is granted as described below. The New York Throwsters asked this Court to grant a summary judgment that:

(a) the manufacturing license agreements signed by Leesona and the fourteen machinery manufacturers violated Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2;

(b) these antitrust violations proximately caused injury to the throwsters for which treble damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, are recoverable;

(c) the single heater and high speed Hilbert spindle patents, owned by Leesona and used as an integral part of these arrangements, have been misused and are therefore unenforceable.

Based on the facts summarized by the Court, points (a) and (c) are well taken and a summary final judgment as to

---

14. Transcript of Proceedings, April 16, 1974, at 81.

15. *Id.* at 84.

16. Reply Memorandum of New York Throwsters in Support of Motion for Summary Judgment, Kayser-Roth Corp. et al. v. Leesona Corporation, 360 F.Supp. 74 (S.D.Fla.).

those two aspects of this litigation will issue. The facts as agreed to, however, do not establish as a matter of law at this point the proximate cause of any damages sustained by the throwsters nor their amount. The trier of fact must determine whether the throwsters will prevail on point (b) as to these counter-claims.

Although no requirement exists under Rule 52(a) for the Court to enter written conclusions of law when granting a summary judgment,

> . . . they are certainly permissible and the practice has been commended as greatly helpful to the appellate court in making clear the basis for the trial court's decision. 3 Barron & Holtzoff, Federal Practice and Procedure, *See* 1242 at 201 (Wright ed. 1958).

*United States for the Use of Industrial Instrument Corp. v. Paul Hardeman, Inc.*, 320 F.2d 115, 116 (5th Cir. 1963). *See Steed v. Central of Georgia Railway Company*, 477 F.2d 1303, 1305 (5th Cir. 1973). Therefore, in the event this ruling is appealed, it may be considered that if the Court had entered its own written conclusions of law on the facts as presented, those findings would compare very favorably with the law contained in the Reply Memorandum of New York Throwsters in Support of Motion for Summary Judgment, pp. 4–60 and 74–101. Accordingly, those portions of the memorandum are hereby adopted by the Court in the interests of brevity.

B. Universal Textured Yarns (hereinafter UTY) summary judgment motion in case Number 72–556–CIV–CA supplements the New York Throwsters motion just discussed to the extent that it seeks a declaration that the double heater (or post-treating) patents, now owned by Lex-Tex of Florida, may not be enforced against it. Twenty-three additional material facts are relied on by UTY; these are recited in accordance with the Court's local rules, although they do lack to some degree the background refer-

ences from which their derivation is accomplished. Lex-Tex, in a somewhat belated fashion, filed its response to those facts and admitted four of them. No memorandum in opposition to this motion has been filed by Lex-Tex in case No. 72–556–CIV–CA, although the memorandum filed in case No. 71–83–CIV–CA appears to deal with the legal principles involved and will be considered for purposes of this motion.

■ After a review of the material submitted with this motion, including the Lex-Tex 10(J)(2) statement with its summary denials of facts elsewhere admitted by itself or one or more of the many former owners of the double heater patents, the conclusion is inescapable that these patents have been misused by both their former owners and Lex-Tex of Florida. The various parties, through the agreements and understandings fully documented in this cause, carefully intertwined these post-treating patents with the overall conspiracy involving the single heater and high speed spindle patents. The Reply Memorandum of Universal Textured Yarns, Inc. to Memorandum of Lex-Tex, Ltd., Inc. in Opposition to Summary Judgment Motion for Unenforceability of Post Treating Patents for Misuse adequately deals with the spurious denials of otherwise non-disputed material facts when that memorandum is read in light of the New York Throwsters reply memorandum. It is indeed difficult for the Court to believe that after Lex-Tex and UTY have litigated over the validity, infringement, and misuse of these particular patents for over *three years*, Lex-Tex is only able to generate only the most perfunctory denials of the material facts that submitted by UTY in support of these motions. That showing bespeaks either an inadequate managing of the discovery proceedings for the two years they have been consolidated in this district, or a genuine lack of enthusiasm on the part of Lex-Tex. The Court prefers to believe the fault lies in the latter.

The motions filed by UTY in case Nos. 71–83–CIV–CA and 72–556–CIV–CA are granted.

C. Celanese and FII filed their motion under Rule 56(c) for Partial Summary Judgment of Illegality of Certain Agreements and Unenforceability of Certain Patents in their declaratory judgment action earlier than any of the other motions ruled on above. The motion requests a declaration that the single heater, double heater ('724 and '912) and spindle patents were unenforceable by Leesona on or before September 22, 1967 because they were subject to the provisions of certain agreements between Leesona and Permatwist which agreements constitute patent misuse. These agreements include the original 1954 agreement between the two, as well as the supplemental agreements of 1958 and 1960 and letter agreements of 1964, 1965 and 1967. The 1954, 1958 and 1960 agreements by their own terms provided for the fixing of both machine and yarn royalties under the single heater patents and subsequently, the high speed spindle patents, while the letter agreements provided for Permatwist's waiver of its rights to the spindle royalty previously fixed. The key facts relied on Leesona are its assertions that (1) Permatwist and Leesona have never been nor would ever be, competitors in the falsetwist machinery business, (2) the 1954 agreement was nothing more than the assignment of patent rights, and (3) the ultimate sale price of the machines themselves were not fixed by the agreements, but only the royalty rates to be charged. Celanese and FII argue that these facts can be accepted by the Court as put forth by Leesona and their right to summary judgment is still not impaired.

The Court cannot agree. The narrow ground on which this motion is predicated, relating as it does to only the legality of the assignment agreement between Permatwist and Leesona together with its supplements, makes inappropriate the entry of a summary judgment on the facts as they now appear in this motion. The 10(J)(2) statements filed by the parties have helped to restrict to a measurable degree the factual areas in dispute, and those efforts are appreciated by the Court. Nevertheless, the motion, as it is framed does require an analysis of the competitive posture of Permatwist *vis-a-vis* Leesona prior to the 1954 agreement that forms the crux of this motion, and therefore the motion must be denied.

IV

*Burlington Industries Motion for Summary Judgment as to Leesona's Sixth Counterclaim*

*Celanese and FII Motion for Summary Judgment Dismissing Count Two and Paragraph 49 of Count Three of Leesona's Antitrust Counterclaims*

These two motions attacking the standing of Leesona to assert certain antitrust counterclaims were filed in case numbers 72–641–Civ–CA and 71–1026–Civ–CA respectively on or about the first week of December, 1973. As briefed by the parties, they rely on substantially the same grounds and were therefore argued by the movants in a more or less joint fashion. The sixth counterclaim filed against Burlington can be summarized by quoting from paragraph 57, which charges that Burlington

has sought to obtain, exercise and maintain such unlawful control and domination [over the synthetic yarn throwing industry] by entering into preferential and discriminatory purchase contracts with suppliers of raw synthetic fibers, by entering into reciprocal arrangements and agreements with purchasers of stretch and set yarns, by unlawfully manipulating and fixing the prices of stretch and set yarns through the undisclosed control by plaintiff Burlington Industries, Inc. of Plaintiff Madison Throwing Company, and by diverse other means.

Count Two of Leesona's antitrust counterclaims against Celanese allege that Celanese "attempted to . . . monopolize and has exercised unlawful control and domination over the synthetic yarn and throwing industries." This scheme had discriminatory practices, "including participation in illegal contracts, combinations and conspiracies." Paragraph 49 of the Third Count charges that Celanese and FII both tried to fix prices and manipulate markets for synthetic yarn here and abroad.

Leesona, as a manufacturer of yarn processing machinery, alleges that these conspiracies and *per se* antitrust violations served to artificially limit the size and growth of the yarn processing industry, thereby eliminating potential markets for its machinery and concomitantly restricting its ability to collect royalties under its patents. Following the conclusion of oral argument on the above-styled motions the Court made the following announcement:

> The question for decision is whether Leesona, assuming the allegations of its counterclaims, supplemented by discovery, to be true, has standing to sue for that part of its claim challenged by the subject to motions for summary judgment.

> It is clear that the alleged monopolization was aimed at competing throwsters and textured yarn purchasers, the synthetic yarn industry.

> Leesona, as the manufacturer and seller of textile machinery is at least one step removed from this segment of the yarn industry. Hence, it is not in the target area of the alleged illegal restraint. An area of the economy that could be endangered by the breakdown of competitive conditions. As a result Leesona was not directly or proximately injured by the lessening of competition therein.

> Accordingly, I find that Leesona lacks standing for either treble damages or injunctive relief.

> The motions for summary judgment dismissing those parts of the counterclaims failed—are granted.[17]

The Court, in ruling on the motions in this fashion, relies on the legal authority cited by both Celanese and Burlington in their memoranda filed in support of these motions. The memorandum filed by Leesona in opposition to these motions, while quite substantial in size,[18] failed to demonstrate to the Court's satisfaction that Leesona was within the target area of these alleged antitrust violations.

## V

*A) Celanese and FII Motion for Partial Summary Judgment of Noninfringement of Spindle Patents by FAG Spindles*

Pursuant to the stipulation entered into by counsel for Celanese and Leesona at the hearing held on April 17, 1974, this motion is denied as moot.

*B) Celanese and FII Motion for Summary Judgment of Noninfringement of Spindle Patents by Spindles of Leesona Manufacture*

Celanese and FII have filed this motion in case number 71–1026–Civ–CA in the hopes that the Court would declare the high speed spindle patents owned by Leesona to not be infringed by Celanese's use of certain previously owned Leesona 553 machines purchased in Europe. After the machines were purchased and brought to the United States, Celanese ordered $22,000 worth of replacement high speed spindles. Leesona agreed to provide Celanese with the re-

---

17. Hearing on *Motions for Summary Judgment*, April 17, 1974, at 87–88.

18. The memorandum went into great detail in attempting to demonstrate the existence of the conspiracies and combinations complained of, apparently on the theory that if they were proven to in fact exist the Court would be loath to dismiss the counterclaims. However, for the purposes of this motion, the court must presume, whether it believes the charges or not, that actual violations did take place.

placement spindles, as well as a service engineer to help install them properly, but attempted to reserve its patent rights with the following language contained in a letter to Celanese:

. . . any subsequent sales of parts to you for use with these machines are without prejudice to Leesona's rights under its patents and will not grant any implied license under such patents.

It is the position of Celanese that Leesona's sale of these 553 machines in Europe without any "condition that the purchaser accept a license" under any Leesona patents exhausts the patent monopoly as to those machines and permits the use of the machines in their intended fashion without risk of infringement. Leesona, on the other hand, argues that

A mere sale imports no license except where the circumstances plainly indicate that the grant of a license was inferred.

*Radio Corporation of America v. Andrea*, 90 F.2d 612, 615 (2d Cir. 1937). The material fact that prevents the granting of this summary judgment, in Leesona's opinion, is the intention of the parties as to the possible granting of a royalty free license with the sale of the replacement spindles. Leesona, however, does not challenge the Celanese position that it may use the 553 machines with their original spindles without risk of infringement.

Curiously enough, counsel at oral argument conceded that they were in agreement on the law to be applied, so no problem is created in that respect. If the machines were "reconstructed" the patent royalties are due Leesona, and if they were "repaired" the royalties are not due. *See Wilbur-Ellis Company v. Kuther*, 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964). Unfortunately for Celanese, its seems clear that whether the addition of the new high speed spindles constituted "repair" or "reconstruction" presents the Court with nothing more than the need to resolve an issue—precisely the task forbidden under Rule 56 of the F.R.Civ.P. It is true that Leesona was somewhat recalcitrant in responding to the interrogatories submitted by Celanese on this precise matter, but that need not preclude them from raising this factual dispute when an answer was finally provided. The motion is denied.

### CONCLUSION

This order has disposed of several substantive aspects of this litigation and will need to be examined closely by counsel for the various parties involved in these 51 consolidated cases in order to determine the exact status of each case in light of its entry. Counsel are requested to provide the Court and opposing counsel as expeditiously as possible with the appropriate summary final judgments in each case where a motion has been granted so that the Court may give consideration to them. Notice of pretrial conferences in those actions with aspects still in issue will be provided by the Court at the time the Order on the remaining summary judgment motions is entered. The time between the notice and the conference is not expected to be more than two weeks, so all counsel should be prepared to submit the appropriate pretrial stipulations accordingly.

### SUPPLEMENTAL OPINION

ORDER VACATING SECTION III(c) OF THE APRIL 25, 1974 "ORDER ON VARIOUS PENDING MOTIONS FOR PARTIAL SUMMARY JUDGMENTS" AND GRANTING PARTIAL SUMMARY JUDGMENT

Celanese and Fiber Industries, Inc.'s (FII) motion under Rule 56(c) for Partial Summary Judgment of Illegality of Certain Agreements and Unenforceability of Certain Patents was denied by this Court's Order of April 25, 1974. The motion sought a declaration that the single heater ('105, '108 and '109), double heater ('724 and '912) (at least until September 22, 1967) and spindle ('086,

'247, and '218) patents were unenforceable by Leesona because they were subject to the provisions of agreements between Leesona and Permatwist which agreements constitute patent misuse. These agreements include the original 1954 agreement between the two as well as supplemental agreements of 1958, and 1960 and letter agreements of 1964, 1965 and 1967. The Court denied summary judgment in the belief that the motion required factual development and analysis of the competitive posture of Permatwist *vis-a-vis* Leesona prior to the 1954 agreement which forms the foundation of the motion.

Celanese and FII have moved for reconsideration of the Court's order citing for the first time, *Battle v. Liberty National Life Insurance Co.*, 493 F.2d 39 (5 Cir. 1974). In light of this precedent and in the interest of a more precise statement of facts, the Court vacates Section III(c) of the April 25, 1974 Order and considers de novo the original Celanese and FII motion. Since the determinations made in Section III(A) & (B) of the April 25, 1974 order are not necessary to reconsideration of the instant motion, for purposes of this decision those summary judgments will not be considered to have been entered.

The Celanese and FII motion recited 30 facts which it considers material and undisputed. Leesona, Permatwist, and Lex-Tex have disputed outright certain facts and disputed others as worded, sometimes adding the proviso that the parties' agreements speak for themselves. Additionally, Leesona, Permatwist and Lex-Tex have proposed eight allegedly material facts which they urge are either in dispute or are undisputed but require denial of summary judgment. In reviewing Lex-Tex and Permatwist's response under Local Rule 10J(2), the impression is created that these parties have not cooperated in the spirit of Federal Rule 56 to aid the Court in its determination of the existence of any *genuine* dispute as to any material fact.

For the convenience of the Appellate Court, in the event this order is appealed, the Court has listed all those facts considered in dispute by the parties as well as the established material facts. Where the parties disagreement concerns the interpretation of a writing which may be solved by looking to the writing alone, the dispute is immaterial since interpretation is for the Judge. *Ammons v. Franklin Life Insurance Company*, 348 F.2d 414, 416–417 (5 Cir. 1965). The Court has considered the following facts:

1. Exhibit A is a true copy of an agreement consummated by Leesona and Permatwist dated December 14, 1954.

2. Exhibit B is a true copy of an agreement consummated by Leesona and Permatwist dated October 17, 1958.

3. Exhibit C is a true copy of an agreement consummated by Leesona and Permatwist dated September 16, 1960.

4. Exhibit D is a true copy of a letter agreement consummated by Leesona and Permatwist dated January 21, 1964.

5. Exhibit E is a true copy of a letter agreement consummated by Leesona and Permatwist dated December 15, 1965.

6. Exhibit F is a true copy of a letter agreement consummated by Leesona and Permatwist dated June 5, 1967.

7. Exhibit G is a true copy of an agreement consummated by Leesona and Permatwist dated September 22, 1967.

Both No. 8's. Celanese's proposed facts are disputed by Leesona and disputed as worded by Permatwist and Lex-Tex which state the agreements speak for themselves. These facts are not material.

10. Celanese and FII's proposed fact is disputed as phrased by Lex-Tex and Permatwist and disputed by Leesona. This fact is immaterial.

11. Each of Leesona (Hilbert) spindle patents 2,791,086, 3,044,247 and 3,134,218; each of the double heater patents 3,077,724 and 3,091,912 (at least until the transfer of said patents

from Leesona to Lex Tex North Carolina pursuant to Exhibit G) and each of the Permatwist (Stoddard and Seem) single heater patents 2,803,105, 2,803,108 and 2,803,109 is subject to the provisions of Exhibit A, B, C, D, E and F.

(a) The Exhibit A agreement in terms includes the single heater patent applications and the patents maturing therefrom. See, e. g. Par. 1(b), p. 2.

(b) With respect to the spindle patents:

(i) Leesona's supplemental answer to Celanese and FII Interrogatory 41 (Exhibit I) filed pursuant to Paragrah 9 of the order of July 30, 1973 states that the spindle patent applications and patents are subject to the December 14, 1954 agreement, Exhibit A as amended. See particularly Answers to Interrogatories 41(A) and (D).

11(b)(ii) The application which became high speed spindle patent 3,044,247 (and its division patent 3,134,218) is the specific subject matter of the second whereas clause of Exhibit B. *See* Celanese Interrogatory 48 to Leesona and Leesona's verified answer.

12. Leesona admits that Permatwist has a continuing right to receive compensation from Leesona based on the use of single heater patents but denies that the transfer to Leesona of Permatwist patent rights in the false twisting field pursuant to Exhibit A, the agreement of December 14, 1954, was not unqualified and that Permatwist still retains any ownership interest in the single heater patents.

Leesona agrees that Leesona and Permatwist have represented to the United States Court of Appeals for the Fifth Circuit:

"On December 14, 1954, the Permatwist partners, *while retaining certain continuing beneficial rights,* assigned their patent applications to Universal Winding Co., now known as Leesona Corporation . . . " [Brief for Leesona, 5th Cir. Case No. 7302 420, pp. 15–16].

Permatwist and Lex-Tex dispute fact 12 as worded and state the rights of Permatwist are as set forth in Exhibit A.

13. Leesona admits that Permatwist has a continuing right to receive compensation from Leesona based on the use of the single heater patents, but denies Permatwist has ownership interest in the single heater patents.

Permatwist and Lex-Tex dispute Celanese's fact as worded and allege the retained rights, if any, of Permatwist are as set forth in the exhibits, which speak for themselves.

14. Leesona responds that Permatwist and Leesona share equally in the royalties received by Leesona from licensing of patents pursuant to the Leesona-Permatwist agreement of December 14, 1954.

Permatwist and Lex-Tex dispute as worded Celanese's proposed fact and respond that Leesona pays to Permatwist payments as set forth in Exhibits A as amended by Exhibits B, C, D, E, and F to the extent that Leesona has collected such royalties.

15. Permatwist and Lex-Tex agree that other continuing beneficial rights of Permatwist in all of the patents subject to Exhibit A agreement are defined at page 15 in paragraph 4(i) thereof as follows:

That Permatwist is vitally interested in any patent litigation that Universal may initiate involving the validity of any patents issued on the applications sold hereunder, and any other patents provided for under the terms of this agreement, by reason of the fact that this agreement terminates in the event the said patents are declared to be invalid. That, therefore, Universal shall not undertake any litigation against infringement of any patents which may be issued on the applications herein transferred and assigned by Permatwist to it, and any other patents which may be granted on the processes, apparatus, and yarns herein transferred and assigned and any improvements therein, additions thereto

and variations thereof, without prior consultation with Permatwist and their prior approval and consent, which shall not be unreasonably withheld.

Although Leesona admits the above recited paragraph is contained in the December 14, 1954 agreement, it denies that Permatwist has any ownership interest in all of the patents subject to the Exhibit A agreement.

16. The December 14, 1954 Exhibit A Agreement provides in paragraph 3C(A)vi:

> vi that the selling price of the machines to be manufactured by Universal [Leesona], or for it—as set forth in paragraph C(A)(i) hereof shall be *fixed* at $75.00 per spindle.
>
> That the selling price of the attachments to be manufactured by Universal [Leesona] or for it, as set forth in paragraph C(A)ii hereof shall be *fixed* at $68.00 per spindle.

That the selling price of the attachments to be manufactured by Universal [Leesona] or for it as set forth in paragraph C(A)(iii) hereof shall be fixed at $68.00 per spindle.

17. Permatwist and Lex-Tex dispute Celanese's fact 17 as worded. Leesona denies in part fact 17 but accepts as true:

> "Celanese and FII Interrogatory 32 (A) and Leesona's supplemental answer verified August 27, 1972 in pertinent part state:
>
> "(A) Identify by model number or other appropriate designation each 'synthetic yarn texturing' machine 'embodying various inventions claimed' in any of patents 2,803,105, 2,803,108 and 2,803,109 and as to each machine identified, state the claim or claims of each patent which define each 'invention' it embodies."

### Supplemental Answer

#### U.S. Patent Claims

| | 2,803,105 | 2,803,108 | 2,803,109 |
|---|---|---|---|
| Fluflon Model 994 | 1, 3, 6, 7 | 1–10 | 1–5, 8 |
| Superloft Model 550 | 1–4, 7 | 1–10 | 1–5, 8 |

The Leesona supplemental answer to Celanese and FII interrogatory 32(c) states that the statutory notices placed on the Model 550 machine include reference to the single heater patents and to spindle patents 2,791,086 and that the statutory notices placed on the Model 994 machines include reference to the single heater patents.

18. The December 14, 1954 Exhibit A agreement provides at page 11 in paragraphs 3D(A), (B) and (C):

> "D. *Agreement upon Royalty Basis.*
>
> "(a) UNIVERSAL covenants and agrees that any license agreements entered into between UNIVERSAL and its licensees (except the royalty free licenses contemplated under the provisions of paragraph C hereof, and a license agreement with Synfoam Yarns, Inc. and Nyl-De-Chine, Inc., which are expressly excluded), including the license agreements transferred hereunder, for the use of either the Permatwist or Universal processes for the production of crimped, fluffed and wavy yarn, shall be fixed at the rate of twenty-five (25¢) cents per pound for 70 denier yarn, with the rates for higher and lower deniers in proportion thereto but not less than ten (10¢) per pound for any denier.
>
> "(b) That UNIVERSAL covenants and agrees that any license agree-

ments entered into between UNIVER-SAL and its licensees for other thermal processing made possible under the patent applications herein sold and transferred under paragraph 2 hereof, and under the UNIVERSAL processes and apparatus shall be *fixed* at such royalty rate per pound as it shall determine, but not less than ten (10¢) cents per pound.

"(c) That in the event UNIVERSAL manufactures or has manufactured for it the attachments upon which a license at the royalty rates herein provided shall be granted to licensees, it will *sell* said attachments upon which the licensed processes shall be used, at not in excess of $28.00 per spindle."

19. The October 17, 1958 Exhibit B agreement states in its "whereas" clauses that "the parties hereto have heretofore entered into an agreement dated December 14, 1954" (Exhibit A), that Leesona has "filed an application for a patent [now high speed spindle patents 3,044,247 and 3,134,218] on a High Speed Spindle," that "the sale of the High Speed Spindle as a replacement spindle for installation upon machines" provided with low speed spindles "and the sale of machines and apparatus of which the said [high speed] spindle is an integral part requires modification of" the Exhibit A Agreement, and that Leesona and Permatwist "have *agreed upon* such modification with respect to price, royalty and participation therein." The Exhibit B agreement then provides:

"1. In addition to its present sale of complete continuous process False Twist machines and apparatus which do *not* incorporate the High Speed Spindle, UNIVERSAL shall offer the High Speed Spindle hereinabove referred to for sale as a replacement spindle on present False Twist machines and apparatus, and also, shall offer for sale complete continuous process False Twist machines and apparatus incorporating the High Speed Spindle. All of said sales shall be made pursuant to the provisions of

the Agreement dated December 14, 1954 as heretofore amended and as further amended pursuant to this agreement. . . . [p. 2]

 * * * * * *

"7. Except as herein modified, the provisions of the Agreement of December 14, 1954, and its supplements, shall continue in full force and effect with respect to all matters herein and therein provided." (p. 9)

20. Leesona agrees "the provisions in paragraph 1 and 7 of the October 17, 1958 Exhibit B agreement which continue the December 17, 1954 agreement in full force and effect "except as herein modified" and the reference to the "present sale of complete continuous process false twist machines and apparatus which do not incorporate the High Speed Spindle" perpetuate the provisions of the December 14, 1954 agreement with respect to the fixed sales price for Leesona Model 550 machines said by Leesona to utilize the invention of the Hilbert low speed spindle patent 2,791,086 and inventions of the single heater Permatwist (Stoddard and Seem) patents and with respect to the Model 994 machines said by Leesona to utilize inventions of the single heater patents.

Permatwist and Lex-Tex dispute Celanese's proposed fact as worded and state the exhibits speak for themselves.

21. Paragraph 2 of the October 17, 1958 Exhibit B agreement states:

"2. The prices to be charged by UNIVERSAL for sales [of high speed spindle equipment using the inventions of spindle patents 3,044,247 and 3,134,218] to be made pursuant to the provisions of Paragraph 1 hereof *are hereby fixed* as follows:"

22. Leesona agrees the high speed spindle equipment, the "prices" for which were "fixed" by paragraph 2 of the October 17, 1958 agreement include the Model 551 and 552 single heater false twist machines which are represented by Leesona to utilize the inventions of the Leesona (Hilbert) high

speed spindle patents 3,044,247 and 3,134,218 and the Permatwist (Stoddard and Seem) single heater patents but denies that the prices for the Model 551 and 552 single heater false twist machines are *now* fixed by paragraph 2 of the October 2, 1958 agreement.

Leesona further admits that Leesona's supplemental answers to Celanese and FII interrogatory 32(A) states that the Model 551, 552, 553, 555 and 556 machines include reference to the high speed spindle patents 3,044,247 and 3,134,218 (except as to Model 551 which does not include patent 3,134,218) and to the single heater patents.

Permatwist and Lex-Tex dispute Celanese's proposed fact as worded and state the document speaks for itself.

23. Par. 5 of the October 17, 1958 Exhibit B agreement provides:

"5. It is an essential provision of this modification agreement that UNIVERSAL *shall* require each purchaser of *High Speed Spindles* or of machines or apparatus incorporating High Speed Spindles *to enter into a License Agreement requiring the said purchaser and licensee to pay royalties on yarn produced thereon at the rate of Six Cents per pound for 70 denier yarn* and for deniers and constructions of yarn at such rates as UNIVERSAL may from time to time determine to be in reasonable proportion to said rate of Six Cents per pound for 70 denier yarn. PERMATWIST shall be entitled to share of such royalties collected by UNIVERSAL, such share to be calculated and paid as follows:"

24. The Exhibit C agreement of September 16, 1960 adverts in its "whereas" clauses to the December 14, 1954 agreement and the October 17, 1958 agreement, states that "Leesona has developed and is about to offer for sale a new and improved High Speed Spindle machine (sometimes presently referred to as its Model 553 machine)" and that "the parties hereto desire by this supplementary agreement to determine the initial sale

price of said machine, etc." The Exhibit C agreement then provides:

"1. The *price* to be charged initially by LEESONA for its new high speed machine presently referred to as the Model 553 machine *is* Two Hundred Twenty-Five Dollars per spindle. Such sale price may be increased to the extent permitted by subsection (1) of Section 2(c) of the agreement of October 17, 1958 [Exhibit B], and to that end LEESONA shall furnish to PERMATWIST as soon as available its initial shop cost for its Model 553 machine which shall be used in determining the permissable amount of any such increase in sale price.

"3. The provisions contained in subsection (g) of Section 4 and in Section 5 [quoted in Fact 23, *supra*] of the agreement of October 17, 1958, shall so far as pertinent, apply with equal force and effect to the rights and liabilities of the parties as established by this agreement, and in particular to the payments to be made by LEESONA to PERMATWIST pursuant to the provisions of this agreement. Except as herein or heretofore modified, the provisions of the agreement of December 17, 1954, and its supplements shall continue in full force and effect with respect to all matters herein and therein provided for." (pp. 1, 2)

25. Leesona admits the Model 553 machine utilizes the inventions of the Leesona (Hilbert) high speed spindle patents 3,044,247 and 3,134,218 and of the Permatwist (Stoddard and Seem) single heater patents. Leesona denies that the prices for the model 553 machine are *now* fixed by paragraph 1 of the Exhibit C, September 16, 1960 agreement, in light of the letter agreements between Leesona and Permatwist of December 16, 1965 (Exhibit E) and June 5, 1967 (Exhibit F).

Permatwist and Lex Tex dispute Celanese's proposed fact as worded and state the document speaks for itself.

(a) Leesona, in its supplemental answer to Celanese and FII Interrogatory 16(c), verified August 7, 1972, has stated under oath:

"(c) All written amendments to the December 17, 1954 agreement between Permatwist and Leesona have been produced for inspection and copying by Celanese and FII. Since the burden of deriving or ascertaining the requested information is substantially the same for Celanese and FII as it is for Leesona, Leesona elects to respond pursuant to Fed.R.Civ.P. 33(c)."

*"Leesona presently knows of no oral amendment* to the Permatwist-Leesona agreement of December 14, 1954."

(b) Leesona, in its original answer to Celanese and FII Interrogatory 47(f) which inquires,

"(f) Has the agreement of October 17, 1958 [Exhibit B hereof] between Permatwist and Universal Winding Company been in any manner modified or amended since it was originally consummated?

\*　　\*　　\*　　\*　　\*　　\*

has sworn

(f) All arguments [sic agreements] between Leesona and Permatwist are being made available as aforementioned in accordance with Rule 33(c) and the answer to this Interrogatory may be ascertained therefrom."

The Leesona "Supplemental" Answer to Interrogatory 47(f) verified August 7, 1972 states:

"(f) The word 'arguments' in the original answer is a typographical error and should read 'amendments'.

*"Leesona presently knows of no oral amendments."*

27. Leesona admits all modifications of the Exhibit A, B and C agreements are written and have been produced.

Lex Tex and Permatwist dispute Celanese's proposed fact.

28. Paragraph 6 of the Exhibit B agreement of October 17, 1958 states:

"6. The parties hereto realize that economic conditions in the industry or other facts and circumstances may make it impossible, or, from a business standpoint, undesirable to sell or license the High Speed Spindles, and 550 type machines and Fluflon apparatus incorporating said spindle *at the prices and royalty rates herein fixed.* In that event, the parties hereto shall consult with each other and shall endeavor mutually to determine such modifications in prices and royalty rates and other terms of this agreement as may be then appropriate. No modification shall *be made by UNIVERSAL without the written consent of PERMATWIST."*

Leesona has sworn that all modifications of the Exhibit B agreement are written and have been produced (see Facts 26(a) and (b)).

Permatwist and Lex-Tex's dispute of Celanese's proposed fact as above-worded is immaterial.

29. Leesona agrees that paragraph 5 of the October 17, 1958 agreement is still in effect, as modified by subsequent amendments.

Permatwist and Lex Tex dispute Celanese's proposed fact.

In addition to Celanese and FII's proposed Facts, Leesona lists the following facts as to which it contends there exists a genuine issue to be tried:

1. Leesona (formerly Universal Winding Co.) and Permatwist are not now and never have been actual or potential competitors in the false twist machinery business. The Court determines this fact is immaterial.

2. All provisions in the Leesona-Permatwist agreement of December 14, 1954 and all modifications to this agreement which relate to prices or royalties are designed to guarantee to Permatwist its sales price for the sale of the inventions assigned to Leesona. The Court determines this fact is immaterial.

3. Under the letter agreement of June 5, 1967 between Permatwist and Leesona, which now governs the calculation of Leesona's purchase price for the

single heater patents, Leesona is not required to pay a spindle or machine royalty unless Leesona shall "sell at any time any stretch yarn machinery at a net selling price resulting in a gross margin significantly in excess (that is to say more than nominal) of the gross margin then regarded by Leesona as its normal gross margin or other comparable textile machinery manufacturing sold by it . . . ." In that event, Leesona "will promptly disclose to Permatwist the amount of such excess and shall pay to Permatwist one half of such excess." Letter Agreement of June 5, 1967. The Court determines this fact is immaterial.

4. Subsequent to the December 15, 1965 letter agreement between Permatwist and Leesona which eliminated the spindle or machine royalty, prices for Leesona's false twist texturing machinery have been set exclusively by Leesona. Permatwist has not participated in the setting of such prices. A. P. Davis Affidavit ¶ 5. The meaning of the December 15, 1965 letter agreement may be resolved from the letter itself and is for the court. Further, whether prices for Leesona's false twist texturing machinery have been set exclusively by Leesona since December 15, 1965 is immaterial for the purpose of this motion.

Those facts which Permatwist and Lex-Tex proffer as either in dispute or which although undisputed require denial of summary judgment are as follows:

1. Celanese and FII acquired their first stretch yarn machinery in about 1971. Prior to that time they had no such machinery nor did they pay royalties under the patents. The Court determines this fact is immaterial.

2. Neither in 1954 nor at any other time was Permatwist in the business of textile machinery manufacturing nor was it a competitor of Leesona or any other textile machinery manufacturer and/or throwster. The Court determines this fact is immaterial.

3. There is no evidence that Lex-Tex, Ltd. has any illegal agreements which would be violative of Section 1 of the Sherman Act at the present time nor at any other time since its acquisition of the double heater patents in September of 1967. The Court determines this fact is immaterial.

4. By agreement dated June 5, 1967, Permatwist and Leesona agreed that the only payment which Permatwist would receive for the sale of its rights would be (1) a percentage of the production royalty to be paid by the user of any machines in the United States and Canada embodying their inventions with no efforts being made to fix the price of either the machinery or the ultimate sales price of the yarn; (2) a percentage of any amounts which Lessona might receive over and above their normally established manufacturer's profit margin in the sale of their machinery with no efforts being made to fix the sales price or profit of that machinery at any given level; and (3) 5% of Leesona's net sales price on machines sold for export without a license requiring the payment of a production royalty with no attempt being made to fix the net or gross selling price. Lex-Tex and Permatwist's proposed fact is denied by Celanese and FII.

It has been Celanese and FII's contention that the facts disclose:

1. The December, 1954; October 17, 1958; and September 16, 1960 agreements between Leesona (then Universal Winding Co.) and Permatwist are patent pooling agreements.

2. The pooling arrangements provided for joint exploitation of the pooled patents and technology of both parties by sale (a) of machines said to embody the patents at agreed upon fixed prices and (b) of licenses to utilize the patented inventions at agreed upon fixed royalty rates.

3. The December, 1954; October 17, 1958; and September, 1960 agreements to fix prices on articles covered by the parties' respective patents and to fix the royalty rates for licenses are outside the patent monopoly and thus are unlawful

*per se* under Section 1 of the Sherman Act.

4. The patents involved are essential to the Leesona-Permatwist conspiracy to violate the antitrust laws and thus unenforceable until the misuse is purged.

5. The December 15, 1965 and June 5, 1967 letter agreements do not cancel from the 1954 agreement as modified in 1958 and 1960, the provisions by which the ultimate machinery sales price is fixed.

6. The December 15, 1965 and June 5, 1967 letter agreements do not cancel or alternatively, terminate the provisions in the 1954, 1958, and 1960 agreements by which the price of a license is fixed.

Leesona has countered these arguments by asserting that the undisputed material facts:

(1) Show that the false twist machinery provisions of the December, 1954; October 17, 1958, and September 16, 1960 agreements have been superceded by the Leesona-Permatwist letter agreements of December 15, 1965 and June 5, 1967. "Thus, under the January 27, 1965 agreement, *made permanent* by the June 13, 1967 agreement, since January 27, 1965 Permatwist's compensation for the sale of their inventions has been limited to the sharing of production royalties" and "prices for stretch yarn machinery have been set exclusively by Leesona." (emphasis supplied) (Leesona's memo at page 4, docket 1700)

(2) Reveal that the false twist machinery sales price provisions were designed to insure that Permatwist received its sales price for the assignment of the three single heater patents to Leesona.

(3) Disclose that the December 14, 1954 agreement between Permatwist and Leesona (Universal Winding Co.) was designed expressly to come within the provision of § 1235(a) of the 1954 Internal Revenue Code.

(4) Do not establish that Leesona and Permatwist were competitors in the false twist machinery business nor that Leesona and Permatwist were substantial potential competitors in the procurement and exploitation of patents involving false twist technology.

(5) Clearly show that the December 14, 1954 agreement did not set prices to be charged by competing machinery manufacturers.

## INTERPRETATION OF AGREEMENTS

To summarize the Court's analysis of the agreements, by the December 14, 1954 agreement Permatwist represented it was the owner of the false twist process, processes and apparatus for producing crimped, fluffed and wavy nylon and other yarns from thermoplastic yarns by insertion of twist into the thermoplastic yarns and its removal immediately thereafter by the same spindle as part of the same process and for other thermal processing, and of the three then pending applications for the single heater patents relating to the "invention", (Par. 1(A) and (b), p. 2 of Exhibit A). In this agreement Permatwist and Leesona (then Universal Winding Co.) referred to the false twist processes, apparatus, and the yarns produced thereby as the "invention." Permatwist purported to sell to Leesona the single heater patent applications and any other patent applications that might be filed with respect to the invention and any other patents granted on applications thereafter filed relating to the invention. (Paragraph 4(g)(iii), p. 14 Exhibit A). For the alleged transfer of the Permatwist false twist patent applications Leesona agreed to pay Permatwist a consideration which includes a share of the agreed-upon fixed selling price for machinery manufactured by Leesona and said to embody the inventions of both the transferred Permatwist patent rights and Leesona's own related patent rights. (Exhibit A, ¶ 3B, p. 7 and ¶ 3C). The December 14, 1954 pooling agreement committed Leesona to license only those machinery manufacturers who

**60**

would agree that purchasers of their machines must first secure from Leesona a user license at an agreed upon fixed running royalty rate per pound of yarn produced (Exhibit A, ¶ 3D). Leesona then must pay to Permatwist 50% of the royalties collected pursuant to the license agreements on the patent applications, processes, and apparatus *transferred* to Leesona (Universal) by Permatwist or under the process *invented by* Leesona (Universal) and by the use of the machines, or equipment manufactured by Leesona (Universal) or caused to be manufactured by Leesona (Universal) for it. [Exhibit A, ¶ 3B(A) and (A)(i)]. An exception to the fixed royalty for a user license exists in the 1954 agreement for the Leesona Model 550 which was sold only when accompanied by a royalty free limited license. [Exhibit A, ¶ 3D].

Upon Leesona's (Universal's) filing for an application on the High Speed Spindle patent and the parties on October 17, 1958 agreed upon modification of the December 14, 1954 agreement with respect to price, royalty, and participation in the agreement. (Exhibit B "whereas" clause 5, p. 1). Fixed machine sale prices were arrived at for (a) the high speed spindle and conversion parts for installation as a replacement spindle on present 550 machines, (b) the high speed spindle for installation as replacement spindles on Fluflon apparatus together with conversion parts, (c) the complete continuous process false twist 550 type machine incorporating said High Speed Spindle (Model 552 machine) and (d) the complete continuous process false twist Fluflon type attachment incorporating the high speed spindle. [Exhibit B, ¶ 2 at pp. 2 and 3]. The 1958 agreement perpetuated the provisions of the December 14, 1954 agreement with respect to the fixed sales price for Leesona Model 550 machines said by Leesona to utilize the invention of the Hilbert low speed spindle 2,791,086 and inventions of the single heater Permatwist patents and with respect to the Model 994 machines said by Leesona to utilize inventions of the single heater patents. [10J(2) Fact 20 agreed upon by Leesona and plain from the face of paragraph 1 and 7 of the October 17, 1958 agreement]. By express provision in paragraph 5 of the 1958 agreement [Exhibit B] Leesona must refuse to sell machines including high speed spindles or the spindles themselves unless the purchaser accepts a license agreement requiring the payment of a running royalty at a fixed rate.

In September of 1960, Leesona was ready to offer for sale its Model 553 high speed spindle machine. Leesona and Permatwist entered into an agreement to determine the initial sale price of new and improved high speed spindle machine (Machine 553) and the portion of the proceeds from the sale of the 553 machine to be paid to Permatwist. [Exhibit C, 3rd "whereas" paragraph]. The agreement sets the initial price to be charged for the Model 553 machine and Permatwist's share of the proceeds [Exhibit C, ¶ 1 and 2]. Section three of the agreement continues in effect the policy of refusing to sell high speed spindle machinery to customers who do not accept a user license at a fixed royalty rate. Except as modified by the supplemental "high speed spindle" price fixing provisions in 1958 and 1960, the price fixing provisions of the 1954 agreement remain in effect under the 1960 agreement. [Exhibit C ¶ 3, p. 2].

Then with the December 15, 1965 letter agreement, Leesona and Permatwist recorded their understandings and agreements with respect to machine royalties which were arrived at during the patentees January, 1964 meeting and in subsequent modifications. In January of 1964, the patentees had agreed that (a) Leesona would continue to pay the $30.38 machine royalty for the Model 553; (b) Permatwist would waive in the United States and Canada payment of machine royalties for the proposed new machine, Model 554, for a period of two years following the first delivery to

a purchaser of a production Model 554 machine (not including the delivery of a prototype, experimental machine) and

(c) Further waiver and suspension of machine royalty payments is to be reconsidered six months prior to the end of the two-year period and annually thereafter, it being agreed that waiver or suspension of machine royalty payments shall continue for additional periods of one year unless and until competitive conditions with respect to the sale of Leesona's stretch yarn machines are materially more favorable to Leesona in January, 1964. Exhibit E and p. 2.

As further set forth in the December, 1965 letter agreement, subsequent to January 1964 Leesona encountered delay in initiating commercial production of a new model machine. To encourage production of the Model 553 machine until an improved machine could be developed and sold, Leesona and Permatwist in July of 1964 entered into an agreement waiving and suspending all machine royalties on further sales of the Model 553 in the United States and Canada.

Near the conclusion of 1964, Leesona considered it desirable to design a new machine, the Model 555, rather than to continue work on the Model 554. The major intent of the parties to the December 15, 1965 letter agreement is that "wherever reference is made to the Model 554 machine in the agreements previously described, such reference is intended and shall be interpreted to include the Model 555 and/or any other model of stretch yarn thereafter developed by Leesona." This letter agreement temporarily halts Permatwist's right to receive a machine royalty, a portion of the machine sales price. The provisions of the 1954 agreement as modified in 1958 and 1960 which fix the ultimate machine sale price and those which fix the price of a license were not cancelled by the December, 1965 letter agreement.

Neither did the June 1967 letter agreement terminate these provisions

[Exhibit F, ¶ 8 and 9]. As the agreement provides in ¶ 8, "Permatwist and Leesona agree that this agreement is not intended to alter in other respects the existing agreements between the parties with respect to processes and apparatus for producing crimped, fluffed and wavy nylon and other yarns from thermoplastic yarns and for other thermal processing." The June 1967 agreement merely suspends Permatwist's receipt of a machine royalty on stretch yarn machines sold to customers in the U.S.A. and Canada unless Leesona sells the "stretch yarn machines at a net selling price resulting in a gross margin significantly in excess of the gross margin then regarded by Leesona as its normal gross margin on other comparable textile machinery manufactured AND sold by it" [Exhibit F, ¶ 1, 4 and 7] and makes special provisions for machines sold outside the United States and Canada.

The Court's interpretation of the 1954, 1958, 1960, 1965 and 1967 agreements applies the standards of interpretation in Restatement of Contracts §§ 230, 235 (1932). These agreements were couched in plain and unambiguous language thus their interpretation was a matter for the Court. *United States v. Taylor*, 293 F.2d 717, 722 (5th Cir. 1961); *Ammons v. Franklin Life Insurance Company*, 348 F.2d 414, 416 (5th Cir. 1965).

## SECTION 1 OF THE SHERMAN ACT

Although a single patentee may fix the price a licensee of the patent charges for the patented device, *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), whenever

. . . a patentee uses his patent as whole or part consideration in a contract by which he and another or other patentees in the same patent field arrange for the practice of any patent involved in such a way that royalties or other earnings or benefits from the patent or patents are shared among the patentees, parties to the agree-

ment, subjects that contract to the prohibitions of the Sherman Act whenever the selling price, for things produced under a patent involved, is fixed by the contract or a license, authorized by the contract. *United States v. Line Material,* 333 U.S. 287, 315, 68 S.Ct. 550, 564, 92 L.Ed. 701 (1948) ; *cf. United States v. New Wrinkle,* 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417 (1952).

With the 1954, 1958 and 1960 agreements Permatwist and Leesona combined their patent monopolies in the same patent field to secure by contractual agreement control of the sale price of the patented devices and control of the sale price [royalty rate] for licenses under the combined patents. As in *Line Material,* Permatwist and Leesona utilized their respective patents as consideration for the 1954, 1958, and 1960 agreements which fix the selling price for things produced under the involved patents.

The patentees urge that the 1954, 1958 and 1960 agreements do not come within the prohibitions of Section One of the Sherman Act, 15 U.S.C. § 1, because Leesona and Permatwist have never been competitors in the false twist machinery business nor substantial competitors in the procurement and exploitation of patents involving false twist technology. This argument has initial appeal as the United States Supreme Court has repeatedly held that the purpose of the Sherman Act is to maintain free competition in interstate commerce. *E. g., American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921).

 Achievement of this goal may be prevented, however, by price fixing agreements between non-competing patentees. This conclusion is suggested by the Court's statement in *Line Material* that

Where two or more patentees with competitive, non-infringing patents combine them and fix prices on all devices produced under any of the pat-

ents, competition is impeded to a greater degree than where a single patentee fixes prices for his licensees. The struggle for profit is less acute. *Even when, as here, the devices are not commercially competitive because the subservient patent cannot be practiced without consent of the dominant, the statement holds good. The stimulus to seek competitive inventions is reduced by the mutually advantageous price fixing arrangement.* (emphasis added) *United States v. Line Material, supra* at 311, 68 S.Ct. at 562.

Further as the Fifth Circuit has stated, "that the defendants do not compete with each other in no way precludes them from combining or conspiring to suppress competition, the ultimate result of which would inure to their mutual benefit." *Battle v. Liberty National Life Insurance Company,* 493 F.2d 39, 44 (5th Cir. 1974). The alleged lack of competition between Leesona and Permatwist does not remove the contractual agreements of 1954, 1958 and 1960 from censure under Section One of the Sherman Act.

 This restraint remains even if as alleged by Leesona the false twist machinery sale price provisions were designed to insure Permatwist's receipt of its sale price for the assignment of the three single heater patents and to come within the provision of § 1235(a) of the 1954 Internal Revenue Code. The Internal Revenue Code does not grant an exception to the antitrust laws.

In another attempt to prevent application of the Sherman Act, Leesona asserts that the false twist machinery provisions of the 1954, 1958 and 1960 agreements have been superceded by the Leesona-Permatwist letter agreements of December 15, 1965 and June 5, 1967. As summarized in the memorandum in opposition to the motion for partial summary judgment (docket 1700 at p. 4) Leesona's position on this argument is "under the January 27, 1965 agreement *made permanent* by the June 13, 1967 agreement since January 27, 1965 Per-

matwist's compensation for the sale of their inventions has been limited to the sharing of production royalties" (emphasis supplied) and "prices for stretch yarn machinery have been set exclusively by Leesona." Albert Davis, patent counsel for Leesona, has sworn by affidavit of October 3, 1973 that since the December 15, 1965 letter agreement prices for Leesona's false twist texturing machinery have been set exclusively by Leesona.

Subsequent to the November 20, 1974 hearing on Celanese's motion for reconsideration, Leesona filed a second affidavit of Mr. Davis for the purpose of explaining his previously filed affidavit. Celanese has objected to consideration of the second affidavit and the Court finds this affidavit inadmissible. The motion for reconsideration was filed on April 30, 1974 (docket 2560) and counsel were notified of the November 20, 1974 hearing on November 13, 1974. With several months to respond to the Celanese motion and a full week notice of the hearing, Leesona's delayed submission of the affidavit, without a request for exception to the time requirement of Federal Rules of Civil Procedure 56(c), cannot remotely be considered excusable neglect. *See Beaufort Concrete Company v. Atlantic States Construction Co.*, 352 F.2d 460, 462 (5th Cir. 1965).

The December 1954, October 1958, and September 1960 agreements to fix prices on articles covered by Permatwist's and Leesona's respective patents are outside the patent monopoly and unlawful *per se* under Section 1 of the Sherman Act. *United States v. Line Material*, 333 U. S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948). The patents involved, as set forth in 10J(2) fact No. 11, are essential to the Leesona-Permatwist conspiracy to violate the antitrust laws and thus unenforceable until the misuse is purged. As earlier stated, the 1965 and 1967 letter agreements did not eliminate the contractual provisions of the 1954 agreement as modified in 1958 and 1960 which fix the ultimate machine sale

price. Therefore, a showing by the Davis Affidavit that the price fixing provisions for the ultimate machine sale price have not been enforced since December of 1965 does not dissipate patent misuse. *See Hensley Equipment Co. v. Esco Corp.*, 383 F.2d 252 (5 Cir. 1967). *See also Copper Liquor Inc. v. Adolph Coors Co.*, 506 F.2d 934 (5th Cir. 1975).

In another attempt to show that the patent misuse has been purged, Lex-Tex, Ltd. alleges that "there is no evidence that Lex-Tex, Ltd. has any illegal agreements which would be violative of Section 1 of the Sherman Act at the present time nor at any other time since its acquisition of the double heater patents in September of 1967." Lex-Tex, Ltd., however, has not briefed for the Court the legal issue of whether solely prospective elimination of price fixing provisions in a contract purges prior patent misuse. Of equal importance, the meaning of Exhibit G, the agreement of September 22, 1967, appears to be a question of fact but this determination should not be made without the assistance of memoranda by counsel.

The double heater patents as well as the other patents set forth in 10J(2) fact No. 11 are unenforceable. Lex-Tex, Ltd. as the double heater patent owner has the burden of proving to the Court that the double heater patent misuse has been purged. This issue may be presented to the Court at a future time.

As a second ground for summary judgment, independent of the contractual provisions which fix the ultimate machine sale price, Celanese seeks to have the 1954 agreement as amended in 1958 and 1960 and by the letter agreements held illegal *per se* because the price of licenses to use the patented machinery has been and is now fixed. If the price of the licenses is fixed Celanese reasons then an important part of the machine sale price is fixed. As stated by the Court in *Standard Oil Co. v. United States*, 283 U.S. 163, 174, 51 S. Ct. 421, 425, 75 L.Ed. 926 (1930).

The rate of royalties may, of course be a decisive factor in the cost of production. If combining patent owners effectively dominate an industry, the power to fix and maintain royalties is tantamount to the power to fix prices . . . *Where domination exists,* a pooling of competing process patents, or an exchange of licenses for the purpose of curtailing the manufacture and supply of an unpatented product, is beyond the privileges conferred by the patents and constitutes a violation of the Sherman Act. [Emphasis added].

After review of fact 45 of Section III(A) of the Court's Order of April 25, 1974, the Court finds that a fuller factual development on the question of the patentees' domination of the industry is required; partial summary judgment on Celanese's second ground is inappropriate.

Accordingly, each of the spindle patents 2,791,086, 3,044,247, and 3,134,218; each of the double heater patents 3,077,724 and 3,091,912; and each of the single heater patents 2,803,105, 2,803,108 and 2,803,109 have been misused and are unenforceable.